(Slip Opinion)      OCTOBER TERM, 2008      1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* NAVAJO NATION

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

No. 07–1410. Argued February 23, 2009—Decided April 6, 2009

The Navajo Nation has long sought damages under the Indian Tucker Act (ITA) for an asserted breach of fiduciary duty by the Secretary of the Interior in connection with his failure promptly to approve a royalty rate increase under a coal lease (Lease 8580) the Tribe executed in 1964. Six years ago, this Court held that "the Tribe's claim for compensation . . . fails." *United States* v. *Navajo Nation,* 537 U. S. 488, 493 *(Navajo I).* The Court explained that in order to invoke the ITA and thereby bypass federal sovereign immunity, a tribe "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *Id.*, at 506. Holding that such duties were not imposed by the Indian Mineral Leasing Act of 1938 (IMLA), by the Indian Mineral Development Act of 1982 (IMDA), or by 25 U. S. C. §399, the Court reversed a judgment for the Tribe and remanded. The Court of Federal Claims then dismissed the Tribe's claim, but the Federal Circuit reversed, finding violations of duties imposed by the Navajo-Hopi Rehabilitation Act of 1950, 25 U. S. C. §§635(a), 638, and the Surface Mining Control and Reclamation Act of 1977, 30 U. S. C. §1300(e), as well as common-law duties arising from the Government's "comprehensive control" over tribal coal.

*Held:* The Tribe's claim for compensation fails. None of the sources of law cited by the Federal Circuit and relied upon by the Tribe provides any more sound a basis for its lawsuit than those analyzed in *Navajo I.* Pp. 8–14.

   (a) *Navajo I* did not definitively terminate the Tribe's claim. Because the Court in that case did not analyze statutes other than the IMLA, the IMDA, and §399, it is conceivable, albeit unlikely, that another relevant statute might have provided a basis for the suit. How-

ever, *Navajo I*'s reasoning—particularly its instruction to "train on specific rights-creating or duty-imposing statutory or regulatory prescriptions," 537 U. S., at 506—left no room for that result based on the sources of law relied on below. P. 8.

(b) Lease 8580 was not issued under §635(a), so the Tribe cannot invoke that law as a source of money-mandating duties. Section 635(a) authorizes leases only for terms of up to 25 years, renewable for up to another 25 years. In contrast, the IMLA allows "terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities." §396a. Mirroring the latter language, Lease 8580's indefinite term strongly suggests that it was negotiated and approved under the IMLA. This conclusion is not refuted by §635(a)'s saving clause or by testimony that coal leasing was a centerpiece of the Rehabilitation Act's program. Pp. 8–11.

(c) Also unavailing is the argument that the Secretary violated §638's requirement that he follow the Tribe's recommendations in administering the "program authorized by this subchapter." The word "program" refers back to §631, which directs the Secretary to undertake "a program of basic improvements for the conservation and development of the [Tribe's] resources" and lists various projects to be included in the program. The statute certainly does not require the Secretary to follow recommendations of the Tribe as to royalty rates under coal leases executed pursuant to another Act. Pp. 11–12.

(d) Title 30 U. S. C. §1300(e) is irrelevant. That provision applies only "[w]ith respect to leases issued after" the statute was enacted in 1977. Lease 8580 was issued in 1964; §1300(e) is therefore inapplicable. Pp. 12–13.

(e) The Government's "comprehensive control" over Indian coal, alone, does not create enforceable fiduciary duties. The ITA limits cognizable claims to those arising under, *inter alia,* "the . . . laws . . . of the United States," 28 U. S. C. §1505, and *Navajo I* reiterated that the analysis must begin with "specific rights-creating or duty-imposing statutory or regulatory prescriptions," 537 U. S., at 506. If a statute or regulation imposes a trust relationship, then common-law principles are relevant in determining whether damages are available for breach of the duty, but the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated, so trust principles do not come into play here. Pp. 13–14.

501 F. 3d 1327, reversed and remanded.

SCALIA, J., delivered the opinion for a unanimous Court. SOUTER, J., filed a concurring opinion, in which STEVENS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

—————

No. 07–1410

—————

## UNITED STATES, PETITIONER *v.* NAVAJO NATION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

[April 6, 2009]

JUSTICE SCALIA delivered the opinion of the Court.

For over 15 years, the Indian Tribe known as the Navajo
Nation has been pursuing a claim for money damages
against the Federal Government based on an asserted
breach of trust by the Secretary of the Interior in connec-
tion with his approval of amendments to a coal lease
executed by the Tribe. The original lease took effect in
1964. The amendments were approved in 1987. The
litigation was initiated in 1993. Six years ago, we held
that "the Tribe's claim for compensation . . . fails," *United
States* v. *Navajo Nation*, 537 U. S. 488, 493 (2003) *(Navajo
I)*, but after further proceedings on remand the United
States Court of Appeals for the Federal Circuit resusci-
tated it. 501 F. 3d 1327 (2007). Today we hold, once
again, that the Tribe's claim for compensation fails. This
matter should now be regarded as closed.

### I. Legal Background

The Federal Government cannot be sued without its
consent. *FDIC* v. *Meyer*, 510 U. S. 471, 475 (1994). Lim-
ited consent has been granted through a variety of stat-
utes, including one colloquially referred to as the Indian
Tucker Act:

"The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe . . . whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group." 28 U. S. C. §1505.

The last clause refers to the (ordinary) Tucker Act, which waives immunity with respect to any claim "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." §1491(a)(1).

Neither the Tucker Act nor the Indian Tucker Act creates substantive rights; they are simply jurisdictional provisions that operate to waive sovereign immunity for claims premised on other sources of law (*e.g.*, statutes or contracts). *United States* v. *Testan*, 424 U. S. 392, 400 (1976); *United States* v. *Mitchell*, 445 U. S. 535, 538 (1980) *(Mitchell I)*. The other source of law need not *explicitly* provide that the right or duty it creates is enforceable through a suit for damages, but it triggers liability only if it "'can fairly be interpreted as mandating compensation by the Federal Government.'" *Testan*, *supra*, at 400 (quoting *Eastport S. S. Corp.* v. *United States*, 178 Ct. Cl. 599, 607, 372 F. 2d 1002, 1009 (1967)); see also *United States* v. *Mitchell*, 463 U. S. 206, 218 (1983) *(Mitchell II); Navajo I,* 537 U. S., at 503.

As we explained in *Navajo I*, there are thus two hurdles that must be cleared before a tribe can invoke jurisdiction under the Indian Tucker Act. First, the tribe "must identify a substantive source of law that establishes specific

fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *Id.*, at 506. "If that threshold is passed, the court must then determine whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s].'" *Ibid.* (alteration in original). At the second stage, principles of trust law might be relevant "in drawing the inference that Congress intended damages to remedy a breach." *United States* v. *White Mountain Apache Tribe*, 537 U. S. 465, 477 (2003).

## II. History of the Present Case
### A. The Facts

A comprehensive recitation of the facts can be found in *Navajo I*, *supra*, at 495–502. By way of executive summary: The Tribe occupies a large Indian reservation in the American Southwest, on which there are significant coal deposits. In 1964 the Secretary of the Interior approved a lease (Lease 8580), executed by the Tribe and the predecessor of Peabody Coal Company, allowing the company to engage in coal mining on a tract of the reservation in exchange for royalty payments to the Tribe. The term of the lease was set at "ten (10) years from the date hereof, and for so long thereafter as the substances produced are being mined by the Lessee in accordance with its terms, in paying quantities," App. 189; it is still in effect today. The royalty rates were originally set at a maximum of 37.5 cents per ton of coal, but the lease also said that the rates were "subject to reasonable adjustment by the Secretary of the Interior" after 20 years and again "at the end of each successive ten-year period thereafter." *Id.*, at 194.

The dispute in this case concerns the Tribe's attempt to secure such an adjustment to the royalty rate after the initial 20-year period elapsed in 1984. At that point, the Tribe requested that the Secretary exercise his power to

increase the royalty rate, and the Director of the Bureau of
Indian Affairs for the Navajo Area issued an opinion letter
imposing a new rate of 20 percent of gross proceeds. *Id.*,
at 8–9. But Peabody filed an administrative appeal, and
while it was pending the Tribe and the company reached a
negotiated agreement to set a rate of 12.5 percent of gross
proceeds instead. As a result, the Area Director's decision
was vacated, the administrative appeal was dismissed,
and the Secretary approved the amendments to the lease.

## B. This Litigation through *Navajo I*

The Tribe launched the present lawsuit in 1993, claim-
ing that the Secretary's actions in connection with the
approval of the lease amendments constituted a breach of
trust. In particular, the Tribe alleged that the Secretary,
following upon improper *ex parte* contacts with Peabody,
had delayed action on Peabody's administrative appeal in
order to pressure the economically desperate Tribe to
return to the bargaining table. This, the complaint
charged, was in violation of the United States' fiduciary
duty to act in the Indians' best interests. The Tribe
sought $600 million in damages, invoking the Indian
Tucker Act to bypass sovereign immunity.

The Court of Federal Claims granted summary judg-
ment to the United States, concluding that "the Navajo
Nation has failed to present statutory authority which can
be fairly interpreted as mandating compensation for the
government's fiduciary wrongs," *Navajo Nation* v. *United
States*, 46 Fed. Cl. 217, 236 (2000), and therefore could not
sue under the Indian Tucker Act. The Federal Circuit
reversed that ruling and held that the Indian Mineral
Leasing Act of 1938 (IMLA), 52 Stat. 347, 25 U. S. C.
§396a *et seq.*, among other statutes, gave the Government
broad control over mineral leasing on Indian lands, thus
creating a fiduciary duty enforceable through suits for
monetary damages. *Navajo Nation* v. *United States*, 263

F. 3d 1325, 1330–1332 (2001). Finding that the Government had in fact violated its obligations, the Court of Appeals reinstated the suit.

We granted certiorari, *United States* v. *Navajo Nation*, 535 U. S. 1111 (2002), and (as described by the author of the ensuing opinion, concurring in a companion case) considered "the threshold question" presented by the Tribe's attempt to invoke the Indian Tucker Act: "[W]hether the IMLA and its regulations impose any concrete substantive obligations, fiduciary or otherwise, on the Government," *White Mountain, supra*, at 480 (GINSBURG, J., concurring). The answer was an unequivocal no.

The relevant provision of the IMLA provided as follows:

> "[U]nallotted lands within any Indian reservation or lands owned by any tribe . . . may, with the approval of the Secretary of the Interior, be leased for mining purposes, by authority of the tribal council or other authorized spokesmen for such Indians, for terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities." 25 U. S. C. §396a.

Another provision of the IMLA authorized the Secretary to promulgate regulations governing operations under such leases, §396d, but during the relevant period the regulations applicable to coal leases, beyond setting a minimum royalty rate of 10 cents per ton, 25 CFR §211.15(c) (1985), did not limit the Secretary's approval authority.

We construed the IMLA in light of its purpose: to "enhance tribal self-determination by giving Tribes, not the Government, the lead role in negotiating mining leases with third parties." *Navajo I*, 537 U. S., at 508. Consistent with that goal, the IMLA gave the Secretary not a "comprehensive managerial role," *id.*, at 507, but only the power to approve coal leases already negotiated by Tribes. That authority did not create, expressly or otherwise, a

trust duty with respect to coal leasing and so there existed no enforceable fiduciary obligations that the Tribe could sue the Government for having neglected. *Id.*, at 507–508.

We distinguished *Mitchell II*, which involved a series of statutes and regulations that gave the Federal Government "full responsibility to manage Indian resources and land for the benefit of the Indians." 463 U. S., at 224. Title 25 U. S. C. §406(a) permitted Indians to sell timber with the consent of the Secretary of the Interior, but directed the Secretary to base his decisions on "a consideration of the needs and best interests of the Indian owner and his heirs" and enumerated specific factors to guide that decisionmaking. We understood that statute—in combination with several other provisions and the applicable regulations—to create a fiduciary duty with respect to Indian timber. *Mitchell II*, *supra*, at 219–224. But neither the IMLA nor its regulations established any analogous duties or obligations in the coal context. *Navajo I*, *supra*, at 507–508.

Nor did the other statutes cited by the Tribe—25 U. S. C. §399 and the Indian Mineral Development Act of 1982 (IMDA), 96 Stat. 1938, 25 U. S. C. §2101 *et seq.*—help its case. Section 399 "is not part of the IMLA and [did] not govern Lease 8580," *Navajo I*, 537 U. S., at 509; rather, it granted to the Secretary the power to lease Indian land on his own say-so. We therefore found it irrelevant to the question whether "the Secretary's more limited *approval* role under the IMLA" created any enforceable duties. *Ibid.* And while the IMDA did set standards to govern the Secretary's approval of other mining-related agreements, Lease 8580 "falls outside the IMDA's domain," *ibid.;* that law was accordingly beside the point.

Having resolved that "we ha[d] no warrant from any relevant statute or regulation to conclude that [the Secretary's] conduct implicated a duty enforceable in an action for damages under the Indian Tucker Act," this Court

reversed the Federal Circuit's judgment in favor of the Tribe and "remanded for further proceedings consistent with this opinion." *Id.*, at 514.

### C. Proceedings on Remand

On remand, the Tribe argued that even if its suit could not be maintained on the basis of the IMLA, the IMDA, or §399, a "network" of other statutes, treaties, and regulations could provide the basis for its claims. The Government objected that our opinion foreclosed that possibility, but the Federal Circuit disagreed and remanded for consideration of the argument in the first instance. 347 F. 3d 1327 (2003). The Court of Federal Claims, however, persisted in its original decision to dismiss the Tribe's claim, explaining that nothing in the suggested "network" succeeded in tying "specific laws or regulatory provisions to the issue at hand," namely, the Secretary's approval of royalty rates in coal leases negotiated by tribes. 68 Fed. Cl. 805, 811 (2005).

Once again the Federal Circuit reversed, this time relying primarily on three statutory provisions—two sections of the Navajo-Hopi Rehabilitation Act of 1950, 64 Stat. 46, 25 U. S. C. §§635(a), 638; and one section of the Surface Mining Control and Reclamation Act of 1977, 30 U. S. C. §1300(e)—to allow the Tribe's claim to proceed. The Court held that the Government had violated the specific duties created by those statutes, as well as "common law trust duties of care, candor, and loyalty" that arise from the comprehensive control over tribal coal that is exercised by the Government. 501 F. 3d 1327, 1346 (2007).

Once again we granted the Government's petition for a writ of certiorari. 554 U. S. \_\_\_ (2008).

### III. Analysis
### A. Threshold Matter

The Government points to our categorical concluding language in *Navajo I:* "[W]e have no warrant from any relevant statute or regulation to conclude that [the Secretary's] conduct implicated a duty enforceable in an action for damages under the Indian Tucker Act," 537 U. S., at 514. This proves, the Government claims, that this Court definitively terminated the Tribe's claim last time around, so that the lower court's later resurrection of the suit was flatly inconsistent with our mandate. But, to be fair, our opinion (like the Court of Appeals decision we were reviewing, *Navajo Nation*, 263 F. 3d, at 1327, 1330–1331) did not analyze any statutes beyond the IMLA, the IMDA, and §399. It is thus conceivable, albeit unlikely, that some other relevant statute, though invoked by the Tribe at the outset of the litigation, might have gone unmentioned by the Federal Circuit and unanalyzed by this Court.

So we cannot say that our mandate completely foreclosed the possibility that such a statute might allow for the Tribe to succeed on remand. What we can say, however, is that our reasoning in *Navajo I*—in particular, our emphasis on the need for courts to "train on specific rights-creating or duty-imposing statutory or regulatory prescriptions," 537 U. S., at 506—left no room for that result based on the sources of law that the Court of Appeals relied upon.

### B. 25 U. S. C. §635(a)

The first of the two discussed provisions of the Navajo-Hopi Rehabilitation Act of 1950—like the IMLA—permits Indians to lease reservation lands if the Secretary approves of the deal:

> "Any restricted Indian lands owned by the Navajo Tribe, members thereof, or associations of such members . . . may be leased by the Indian owners, with the

approval of the Secretary of the Interior, for public, re-
ligious, educational, recreational, or business pur-
poses, including the development or utilization of
natural resources in connection with operations under
such leases. All leases so granted shall be for a term
of not to exceed twenty-five years, but may include
provisions authorizing their renewal for an additional
term of not to exceed twenty-five years, and shall be
made under such regulations as may be prescribed by
the Secretary. . . . Nothing contained in this section
shall be construed to repeal or affect any authority to
lease restricted Indian lands conferred by or pursuant
to any other provision of law." 25 U. S. C. §635(a).

The Tribe contends that this section renders the Govern-
ment liable for any breach of trust in connection with the
approval of leases executed pursuant to the authority it
grants. Whether or not that is so, the provision only even
*arguably* matters if Lease 8580 was issued under its au-
thority.

In *Navajo I* we presumed, as did the parties, that the
lease had been issued pursuant to the IMLA. 537 U. S., at
495. But now the Tribe has changed its tune, and con-
tends that Lease 8580 was approved under §635(a), not
under the IMLA at all. Brief for Respondent 39. The
Government says otherwise. Section 635(a) permits leas-
ing only for "public, religious, educational, recreational, or
business purposes," and the Government contends that
mining is not embraced by those terms. While leases
under §635(a) may provide for "the development or utiliza-
tion of natural resources," they may do so only "in connec-
tion with operations under such leases," *i.e.*, in connection
with operations for the enumerated purposes. By con-
trast, *mining* leases were permitted and governed by the
IMLA even before the Navajo-Hopi Rehabilitation Act was
enacted in 1950.

We need not decide whether the Government is correct on that point, or whether mining could ever qualify as a "business purpose" under the statute, because the Tribe's argument suffers from a more fundamental problem. Section 635(a) authorizes leases only for terms of up to 25 years, renewable for up to another 25 years. In contrast, the IMLA allows "for terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities." 25 U. S. C. §396a. Lease 8580, mirroring the latter language, sets a term of "ten (10) years from the date hereof, and for so long thereafter as the substances produced are being mined by the Lessee in accordance with its terms, in paying quantities." App. 189. That indefinite lease term strongly suggests that it was negotiated by the Tribe and approved by the Secretary under the powers authorized by the IMLA, not the Rehabilitation Act.

The Tribe's only responses to this apparently fatal defect in its argument are (1) that §635(a) expressly leaves unaffected "any authority to lease restricted Indian lands conferred by or pursuant to any other provision of law," including the authority to lease for indefinite terms; and (2) that Stewart Udall, who served as Secretary of the Interior during the 1960's, recently testified that "coal leasing and related development was the centerpiece of the resources development program" under the Rehabilitation Act, *id.*, at 569.

As to the former: That is precisely the point. Section 635(a) creates a *supplemental* authority for leasing Indian land; it does not displace authority granted elsewhere. But in light of the different conditions attached to the different grants, it is apparent that a *particular* lease must be executed and approved pursuant to a *particular* authorization. The saving clause in §635(a) does not allow the Tribe to mix-and-match, to combine the (allegedly) duty-creating mechanism of the Rehabilitation Act with the indefinite lease term of the IMLA. It must be one or

the other, and the record persuasively demonstrates that Lease 8580 is an IMLA lease.

As to Secretary Udall's testimony: That is not inconsistent with our conclusion. The Interior Department may have viewed coal leasing as an important part of the program to rehabilitate the Navajo Tribe but that does not prove that Lease 8580 was issued pursuant to the supplemental leasing authority granted by the Rehabilitation Act, rather than the pre-existing leasing authority of the IMLA preserved by the Rehabilitation Act. The latter, perhaps because of its longer lease terms, was evidently preferable to the Tribe or the coal company or both.

Because the lease in this case "falls outside" §635(a)'s "domain," *Navajo I*, *supra*, at 509, the Tribe cannot invoke it as a source of money-mandating rights or duties.

### C. 25 U. S. C. §638

Next, the Tribe points to a second provision in the Navajo-Hopi Rehabilitation Act:

> "The Tribal Councils of the Navajo and Hopi Tribes and the Indian communities affected shall be kept informed and afforded opportunity to consider from their inception plans pertaining to the program authorized by this subchapter. In the administration of the program, the Secretary of the Interior shall consider the recommendations of the tribal councils and shall follow such recommendations whenever he deems them feasible and consistent with the objectives of this subchapter." 25 U. S. C. §638.

In the Tribe's view, the Secretary violated this provision by failing promptly to abide by its wishes to affirm the Area Director's order increasing the royalty rate under Lease 8580 to a full 20 percent of gross proceeds.

We cannot agree. The "program" twice mentioned in §638 refers back to the Act's opening provision, which

directs the Secretary to undertake "a program of basic improvements for the conservation and development of the resources of the Navajo and Hopi Indians, the more productive employment of their manpower, and the supplying of means to be used in their rehabilitation." §631. The statute then enumerates various projects to be included in that program, and authorizes appropriation of funds (in specific amounts) for each. *E.g.*, "Soil and water conservation and range improvement work, $10,000,000." §631(1).

The only listed project even remotely related to this case is "[s]urveys and studies of timber, coal, mineral, and other physical and human resources." §631(3). Of course a lease is neither a survey nor a study. To read §638 as imposing a money-mandating duty on the Secretary to follow recommendations of the Tribe as to royalty rates under coal leases executed pursuant to another Act, and to allow for the enforcement of that duty through the Indian Tucker Act, would simply be too far a stretch.

### D. 30 U. S. C. §1201 *et seq.*

The final statute invoked by the Tribe is the most easily dispensed with. The Surface Mining Control and Reclamation Act of 1977 (SMCRA), 91 Stat. 445, 30 U. S. C. §1201 *et seq.*, is a comprehensive statute that regulates all surface coal mining operations. See generally §1202; *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 268–272 (1981). One section of the Act, §1300, deals with coal mining specifically on Indian lands, and the Tribe cites subsection (e): "With respect to leases issued after [the date of enactment of this Act], the Secretary shall include and enforce terms and conditions in addition to those required by subsections (c) and (d) of this section as may be requested by the Indian tribe in such leases."

According to the Tribe, this provision requires the Secretary to enforce *whatever* terms the Indians request with

respect to coal leases. In light of the fact that the referenced subsections (c) and (d) refer exclusively to environmental protection standards, that interpretation is highly suspect. In any event, because Lease 8580 was issued in 1964—some 13 years before the date of enactment of the SMCRA—the provision is categorically inapplicable. The Federal Circuit concluded otherwise on the theory that the *amendments* to the lease were approved after 1977. But §1300(e) is limited to leases "issued" after that date; and even the Tribe does not contend that a lease is "issued" whenever it is amended. The SMCRA is irrelevant here.

### E. Government's "Comprehensive Control" over Coal

The Federal Circuit's opinion also suggested that the Government's "comprehensive control" over coal on Indian land gives rise to fiduciary duties based on common-law trust principles. It noted that the Government had conducted surveys and studies of the Tribe's coal resources, 501 F. 3d, at 1341; that the Interior Department imposed various requirements on coal mining operations on Indian land—regulating, for example, "signs and markers, post-mining use of land, backfilling and grading, waste disposal, topsoil handling, protection of hydrologic systems, revegetation, and steep-slope mining," *id.*, at 1342; and that the Government in practice exercised control over the calculation of coal values and quantities for royalty purposes, even though such control was codified by regulation only after the events at issue here, *id.*, at 1342–1343.

The Federal Government's liability cannot be premised on control alone. The text of the Indian Tucker Act makes clear that only claims arising under "the Constitution, laws or treaties of the United States, or Executive orders of the President" are cognizable (unless the claim could be brought by a non-Indian plaintiff under the ordinary Tucker Act). 28 U. S. C. §1505. In *Navajo I* we reiterated that the analysis must begin with "specific rights-creating

or duty-imposing statutory or regulatory prescriptions." 537 U. S., at 506. *If* a plaintiff identifies such a prescription, and *if* that prescription bears the hallmarks of a "conventional fiduciary relationship," *White Mountain*, 537 U. S., at 473, *then* trust principles (including any such principles premised on "control") could play a role in "inferring that the trust obligation [is] enforceable by damages," *id.*, at 477. But that must be the second step of the analysis, not (as the Federal Circuit made it) the starting point.

*Navajo I* determined that the IMLA, which governs the lease at issue here, does not create even a "'limited trust relationship'" with respect to coal leasing. *Navajo I, supra*, at 508 (quoting *Mitchell I*, 445 U. S., at 542). Since the statutes discussed in the preceding subparts, *supra*, at 8–13, do not apply to the lease at all, they likewise create no such relationship. Because the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated, we do not reach the question whether the trust duty was money mandating. Thus, neither the Government's "control" over coal nor common-law trust principles matter.

*      *      *

None of the sources of law cited by the Federal Circuit and relied upon by the Tribe provides any more sound a basis for its breach-of-trust lawsuit against the Federal Government than those we analyzed in *Navajo I*. This case is at an end. The judgment of the Court of Appeals is reversed, and the case is remanded with instructions to affirm the Court of Federal Claims' dismissal of the Tribe's complaint.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 07–1410

———————

## UNITED STATES, PETITIONER *v.* NAVAJO NATION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

[April 6, 2009]

JUSTICE SOUTER, with whom JUSTICE STEVENS joins,
concurring.

I am not through regretting that my position in *United
States* v. *Navajo Nation*, 537 U. S. 488, 514–521 (2003)
(dissenting opinion), did not carry the day.  But it did not,
and I agree that the precedent of that case calls for the
result reached here.