*1285 Opinion for the court filed by Circuit Judge TARANTO.
Opinion concurring-in-part and dissenting-in-part filed by Circuit Judge REYNA.
TARANTO, Circuit Judge.
The United States currently holds certain tracts of land in Minnesota in trust for three Indian communities. It originally acquired some of that land in the late 1800s, using funds appropriated by Congress to help support a statutorily identified group of Indians, and held it for the benefit of those Indians and their descendants for decades. As time passed, that beneficiary group and the three present-day communities that grew on these lands overlapped but diverged: many of the beneficiary group were part of the communities, but many were not; and the communities included many outside the beneficiary group. In 1980, Congress addressed the resulting land-use problems by putting the lands into trust for the three communities that had long occupied them. Ever since, proceeds earned from the lands— including profits from gaming — have gone to the same three communities.
The discrepancy between the makeup of the three communities and the collection of descendants of the Indians designated in the original appropriations acts underlies the present dispute, which was before this court once before. Claimants allege that they belong to the latter group and that they, rather than the communities, hold rights to the land at issue and any money generated from it. Four years ago, based on an extensive analysis of the relevant laws and history, we rejected what was then the only live claim, which got to the heart of their assertion: that the appropriations acts created a trust for the benefit of the statutorily designated Indians and their descendants. Wolfchild v. United States, 559 F.3d 1228 (Fed.Cir.2009). On remand, claimants advanced several new claims, some of which seek proceeds generated from the lands, others of which seek more. Again unable to find that claimants have stated a claim that meets the standards of governing law, we now reject these new claims, including the one that the Court of Federal Claims held valid in the judgment we review.
BACKGROUND
A
The Minnesota Sioux originally lived along a northern stretch of the Mississippi River. But in the middle of the nineteenth century, including in treaties of 1851 and 1858, the group ceded its aboriginal land to the United States. In return for territory and promises of peace, the Sioux received a reservation along the Minnesota River (a tributary of the Mississippi) and assurances of compensation.
This arrangement was short-lived. By 1862, many of the Sioux, whose grievances we need not detail, rebelled. The United States defeated the uprising, but not before many non-Indian settlers had been killed and their property damaged.
Congress responded to the rebellion with two statutes in early 1863. The first annulled all treaties with the Sioux and declared that much of the money still owing to the Indians would be paid to non-Indian Minnesota families harmed during the conflict. Act of Feb. 16, 1863, ch. 37, 12 Stat. 652. The second, passed the following month, focused on moving the rebellious Sioux out of Minnesota and redistributing their former reservation land. Act of Mar. 3, 1863, ch. 119, 12 Stat. 819.
Both statutes, however, also recognized that some individual Sioux had remained loyal to the United States during the revolt and were now left without benefits *1286 under the annulled treaties and without the tribal affiliation they had broken by siding with the United States. The February Act, therefore, authorized the Secretary of the Interior to “set apart ... eighty acres in severalty to each individual ... who exerted himself in rescuing the whites” and provided that any land “so set apart ... shall be an inheritance to said Indians and their heirs forever.” Act of Feb. 16, 1863, § 9, 12 Stat. at 654. The March Act similarly allowed the Secretary to locate any of the same “meritorious individual Indian[s]” on certain former reservation lands, “to be held by such tenure as is or may be provided by law.” Act of Mar. 3,1863, § 4,12 Stat. at 819.
Two years later, in 1865, the United States took additional steps to try to help the loyal Sioux. First, Congress appropriated $7,500 to “make ... provision^] for their welfare” because they were “entirely destitute.” Act of Feb. 9, 1865, ch. 29, 13 Stat. 427. Shortly thereafter, the Secretary of the Interior approved the withdrawal from public sale of 12 sections of land (12 square miles, or 7,680 acres), invoking the land-allocating authority of the two 1863 Acts. But opposition from local residents developed, leading officials to abandon this effort to secure a more permanent settlement for the loyal Sioux. The 12 parcels were returned to public sale and sold.
Congress took no further action to assist the loyal Sioux until the 1880s. By that time, many of them had moved out of Minnesota, but a small number of Mde-wakantons — the name of one of the bands of Minnesota Sioux — had remained in or returned to the state. Beginning in 1884, Congress appropriated funds that Interior paid directly to these Mdewakantons or used to buy land that was then transferred to them in fee. Many Mdewakantons failed to hold onto clean title in their land, however, and the federal government soon changed its approach.
In 1888, 1889, and 1890, Congress passed three statutes appropriating a total of $40,000 to support the Mdewakantons who had resided in (or been moving to) Minnesota on May 20, 1886 and had “severed their tribal relations.” Act of June 29, 1888, ch. 503, 25 Stat. 217, 228-29; Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 992-93; Act of Aug. 19, 1890, ch. 807, 26 Stat. 336, 349. The Acts authorized the Secretary to spend the funds on a number of items, including lands, cattle, horses, and agricultural implements. Id. With some of the money, the government purchased land in four Minnesota counties — Scott, Redwood, Goodhue, and Wabasha. This time, rather than transfer ownership rights directly to the Indians, the United States retained title in the land and assigned only rights of possession and use.
During the decades that followed, communities formed on the land in three of the four counties. Unsurprisingly, the communities consisted largely of Indians who had descended from the Mdewakantons identified in the 1888-1890 Acts and for whose benefit lands were purchased under those Acts. But the overlap between the communities and the class of statutory beneficiaries was not perfect: the communities included some people who were not descendants of these Mdewakantons, and not all of the descendants of these Mdweakantons were members of the three communities.
The 1934 enactment of the Indian Reorganization Act (IRA) had two significant consequences for the three communities. First, the Act granted Indians a right to “organize for [their] common welfare.” Act of June 18, 1934, ch. 576, § 16, 48 Stat. 984, 987. The Secretary permitted the Minnesota communities to organize as the Prairie Island Indian Community (on the *1287 land in Goodhue County), the Shakopee Mdewakanton Sioux Community (in Scott County), and the Lower Sioux Indian Community (in Redwood County). Second, the Act authorized the Secretary to purchase land for Indians and provided that title to any such land would be “taken in the name of the United States in trust” for the beneficiaries. Id. § 5, 48 Stat. at 985. After 1934, the government acquired additional territory for the Prairie Island and Lower Sioux communities under this statute and held those lands in trust for those two communities.
The three communities encountered difficulties in managing the land they occupied. A significant reason was that, while some of the land was held under the IRA for the communities as a whole, much of the land was held for the use and benefit of certain Mdewakantons, rather than the communities. In 1980, Congress set out to resolve the problem by declaring that “all right, title, and interest of the United States” in the land acquired under the 1888-1890 appropriations acts would “hereafter be held by the United States ... in trust” for the three communities. Act of Dec. 19, 1980, Pub.L. No. 96-557, 94 Stat. 3262. That enactment equalized the status of the land acquired under the IRA and the land purchased under the 1888-1890 Acts: all the land was now held in trust for the benefit of those communities.
B
The varying rights to the land acquired in the aftermath of the 1862 rebellion have had significant consequences for the distribution of money related to that land. Over the years, the land has produced revenue in different ways. In 1944, for example, Congress generated $1,261.20 when it authorized the transfer to a wildlife refuge of land “no longer used by Indians” in Wabasha County — one of the four counties in which land was purchased under the 1888-1890 Acts. Act of June 13, 1944, Pub.L. No. 78-335, §§ 1-2, 58 Stat. 274. Later, but still before 1980, the Department of the Interior leased or licensed land bought under the. 1888-1890 Acts when no eligible Mdewakanton was available for assignment, and it then either passed the proceeds to third parties or held them in accounts at the Treasury Department. After 1980, the introduction of casino gambling on the land generated substantial profits.
To date, the three communities and their members have received all of this money. In Í981 and 1982, Interior disbursed to the three communities funds derived from the Wabasha County land transfer and from the leasing of unused lands — amounting to $61,725.22 in 1975, over $130,000 at the time of disbursement, and about $675,000 today. The extensive gaming profits earned from casinos and other businesses have likewise gone to members of the communities for whom the lands are currently held in trust.
This lawsuit began as — and to a large extent continues to be — a dispute about those revenues. In 2003, a group claiming to be descendants of the Mdewakantons who were eligible for benefits under the 1888-1890 Acts brought suit against the government. The principal theory asserted was that the 1888-1890 Acts created a trust for their benefit and that the government had breached that'trust by allowing proceeds from the lands purchased under those Acts to go to the three communities. In 2009, in an interlocutory appeal, we rejected that argument, holding that the 1888-1890 Acts did not create a trust for the statutorily designated beneficiaries or their descendants and that,, even if there was such a trust, it was terminated by the 1980 Act. Wolfchild v. United States, 559 F.3d 1228 (Fed.Cir.2009).
*1288 On remand, several groups of claimants filed motions to amend their complaints to add a number of claims not previously-asserted. They continued to pursue revenues derived from the land (now under new theories), and they also sought to add claims based on the government’s alleged failure to provide them with more land in the 1800s. Claimants rooted their proposed causes of action in a variety of authorities, including the 1863 Acts, the 1888-1890 Acts, the Indian Non-Intercourse Act, and the Takings Clause of the Fifth Amendment.
The Court of Federal Claims addressed the motions to amend in two decisions. The first decision granted claimants leave to add one count, concerning the 1888-1890 Acts, and ruled favorably on that claim in part: it found the government liable on a claim to pre-1980 revenues from the lands acquired under the 1888-1890 Acts, but rejected any claim to funds generated from the lands after the passage of the 1980 Act. Wolfchild v. United States, 96 Fed.Cl. 302 (2010). The next year, the Claims Court denied claimants’ motions to add claims under the Indian Non-Intercourse Act, the 1863 Acts, and the Takings Clause because the proposed causes of action “would not withstand a motion to dismiss.” Wolfchild v. United States, 101 Fed.Cl. 54, 76 (2011). The court also established a process for distribution of damages awarded in the judgment concerning the pre-1980 revenues from land bought under the 1888-1890 Acts. Id. at 86-92.
The parties have filed three separate appeals from those decisions. The government seeks reversal of the judgment regarding pre-1980 revenues (and challenges the distribution process), and two plaintiff groups challenge the rejection of various other claims they sought to add to their complaints. We have jurisdiction under 28 U.S.C. § 1295(a)(3).
DISCUSSION
A
1
The first appeal before us, brought by the government, concerns claimants’ alleged right to pre-1980 revenues generated from the lands purchased under the 1888-1890 Acts. The question is whether the Acts create a “money-mandating” duty that extends to the claim made by these claimants, i.e., applies to proceeds earned from land bought with the original appropriations and requires that such proceeds, if and when they accrue, be paid to descendants of the original beneficiaries identified in the statutes more than a century ago. We conclude that the 1888-1890 Acts do not impose such a money-mandating duty, which presents a question of law, Ferreiro v. United States, 501 F.3d 1349, 1351 (Fed.Cir.2007), and we therefore reverse the Claims Court’s judgment against the United States.
A viable claim under the Indian Tucker Act, 28 U.S.C. § 1505, requires that the plaintiffs “ ‘identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties.’ ” United States v. Navajo Nation, 556 U.S. 287, 290, 129 S.Ct. 1547, 173 L.Ed.2d 429 (2009) (Navajo II). The court then must decide whether the identified source of law “ ‘can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties ... impose[d].’ ” Id. at 291, 129 S.Ct. 1547. Implicit in these requirements is the logical premise that the asserted source of a duty must apply to the particular plaintiffs’ claim: plaintiffs “cannot invoke [a statute] as a source of mon *1289 ey-mandating rights or duties” if the basis for their complaint “ ‘falls outside’ [the statute’s] domain.’ ” Id. at 299-300, 129 S.Ct. 1547; see United States v. Navajo Nation, 537 U.S. 488, 509, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003) (Navajo I) (rejecting reliance on a statute that “does not establish standards governing” the particular type of conduct at issue); id. at 513, 123 S.Ct. 1079 (assertions “are not grounded in a specific statutory ... provision that can fairly be interpreted as mandating money damages” if the provisions invoked do not “proscribe[ ] the [conduct] in th[at] case”). As this court has held, “[t]he statute must ... be money-mandating as to the particular class of plaintiffs.” Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 876 n. 2 (Fed.Cir.2007); see Jan’s Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1308 (Fed.Cir.2008).
Those prerequisites control this appeal because, even if the 1888-1890 Acts were money-mandating as to some benefits for some people (say, the original appropriation for the original designated Indians), the claimants that are now here have not identified a money-mandating duty in the 1888-1890 Acts requiring that proceeds from certain lands be distributed to them as descendants of the designated Indians. To begin with, the text of the Acts contains no “specific rights-creating or duty-imposing statutory ... prescriptions” that apply to the present claim and claimants. Navajo I, 537 U.S. at 506, 123 S.Ct. 1079. On the contrary, any prescriptions in the Acts — indicating, for example, who the beneficiaries are, and that each Indian “shall receive[], as nearly as practicable an equal amount in value of this appropriation,” Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 993 — do not go beyond requiring that the original Indians designated in the Acts benefit from the expenditure of the money appropriated. The statutes neither mention “descendants” of those designated Indians nor say anything about proceeds that may or may not accrue from what was bought with the appropriated funds. The only express mandates in the Acts, in other words, begin and end with the expenditure of money appropriated in those Acts, for the benefit of the Indians specified in those Acts.
With the statutory text silent about any “specific fiduciary or other duties” concerning future proceeds or descendants, Navajo II, 556 U.S. at 290, 129 S.Ct. 1547 (internal quotation marks omitted), claimants must be able to show that such a duty is properly inferred from the language. The Claims Court inferred the requisite duty by reasoning that, because the Secretary viewed the 1888-1890 Acts as providing the authority to generate leasing revenues for the benefit of descendants of the original Indians, all of the requirements in those Acts necessarily attached to direct the spending of revenues generated under that authority. See Wolfchild, 96 Fed.Cl. at 336-37. But that line of reasoning does not support the required inference of a money-mandating duty applicable here.
The Secretary’s authority to act does not support inference of the asserted duty to act (enforceable by a suit for money damages). At the threshold, the mere authority to generate leasing revenues does not carry with it any obligation to do so. The Secretary would not have violated any provision of the Acts if he had opted not to generate any leasing (or other) proceeds at all after the initial funds were spent.
That leaves only the argument that, once the government had collected land revenues that never had to be earned in the first place, the Acts imposed a duty that dictated how to spend those revenues — specifically, for descendants. Simply stating the argument, however, makes clear that it is, in substance, a claim that *1290 everything bought with the original appropriations, and proceeds from such purchases, were to be held in trust for the Indians and their descendants. Claimants recognized that this was their essential claim when they made just that argument under the 1888-1890 Acts throughout this case’s initial stages. But this court rejected that trust claim in 2009, after full analysis of the statutory language, history, and implementation, an analysis we need not repeat here. Wolfchild, 559 F.3d 1228. Having reserved the present issue for later analysis “to the extent necessary,” id. at 1260 n. 14, we now conclude that our rejection of the trust claim four years ago — a matter of substance, not labels — requires rejection of what amounts, at bottom, to the same substantive claim here.
Pragmatic considerations reinforce our conclusion. Specifically, adopting claimants’ argument would present such substantial practical problems that, in the absence of much clearer language than exists, the statutes cannot fairly be read to impose the money-mandating duty that claimants assert. The funds at issue were first disbursed nearly 100 years after the original appropriations acts became law, by which time descendants had spread out geographically and numbered in the thousands. The particular Acts at issue applied to Indians that did not constitute an organized tribe or other easily identified and stable beneficiary group. If claimants’ view about descendants and proceeds were right, simply sorting out who was owed money, as well as when they were to be paid and how (instructions absent from the statutes), would, by the early 1980s, have imposed a tremendous burden on the Department of the Interior and, then, on any court called on to review Interior’s actions.[1] Given the inevitable exacerbation of such difficulties over time, a more explicit direction from Congress is needed to justify inferring not just a grant of discretionary authority but a mandate enforceable in court through damages.
For these reasons, we are persuaded that, for the claim at issue, there is “no warrant from any relevant statute or regulation to conclude that [Interior’s] conduct implicated a duty enforceable in an action for damages under the Indian Tucker Act.” Navajo I, 537 U.S. at 514, 123 S.Ct. 1079. That conclusion requires that we reverse the judgment of the Claims Court on this claim.
2
We would reverse in any event on an independent ground: claimants filed this claim too late. Claimants filed this suit in 2003, more than twenty years after the pre-1980 revenues were disbursed to the three communities in 1981 and 1982. The presentation of the claim was out of time under the six-year statute of limitations, 28 U.S.C. § 2501, unless, as the Claims Court concluded, it was rendered timely by the Indian Trust Accounting Statute (ITAS). See Wolfchild, 96 Fed.Cl. at 332-35. The ITAS, which has been included in appropriations acts since 1990, provides that “notwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim ... concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there *1291 has been a loss.” E.g., Pub.L. No. 108-108, 117 Stat. 1241, 1263 (2003). Unlike the Claims Court, however, we conclude for at least two reasons that the ITAS does not apply to this claim — a question of law, see Gillig v. Nike, Inc., 602 F.3d 1354, 1358 (Fed.Cir.2010).
First, the claim to pre-1980 revenues is not a “claim[ ] concerning ... losses to or mismanagement of trust funds.” The claim does not involve “trust funds” because no trust duty applied to this money, as we held in 2009. Wolfchild, 559 F.3d at 1255. The Claims Court ruled that the funds nevertheless fell within the purview of the ITAS because they were deposited and held in Treasury accounts that were sometimes referred to as “trust” accounts and an Interior regulation, 25 C.F.R. § 115.002, defines “trust funds” to include “any ... money that the Secretary must accept into trust.” Wolfchild, 96 Fed.Cl. at 331-35. But “trust funds” under the statute naturally refers to funds subject to certain substantive duties, not to the labels on or handling of Treasury accounts. The funds at issue here were not subject to a trust duty. And the cited regulation undermines, rather than supports, claimants’ position, because these were not funds that the Secretary “must” have accepted into trust. This claim does not concern “trust funds.”
Second, even if the funds at issue were trust assets, the claim made here would not be the sort of claim for which a final accounting would be necessary to put a plaintiff on notice of a claim, because claimants knew or should have known that the money was publicly distributed in 1981 and 1982. The ITAS says that the statute of limitations does not commence to run for claims “concerning losses to or mismanagement of trust funds” until the beneficiary receives “an accounting ... from which [it] can determine whether there has been a loss.” Consistent with the reason for the enactment, as explained in Shoshone Indian Tribe v. United States, 364 F.3d 1339, 1346-48 (Fed.Cir.2004), the two quoted phrases are properly read together: the claims about “losses” or “mismanagement” that are protected by this provision are those for which an accounting matters in allowing a claimant to identify and prove the harm-causing act at issue; otherwise, the ITAS would give claimants the right to wait for an accounting that they do not need. When a claim concerns an open repudiation of an alleged trust duty, “a ‘final accounting’ [i]s unnecessary to put the [claimants] on notice of the accrual of [their] claim.” San Carlos Apache Tribe v. United States, 639 F.3d 1346, 1355 (Fed.Cir.2011) (relying on Shoshone ). That description fits this case: claimants did not need an accounting in order to “determine whether there ha[d] been a loss” because the funds at issue were openly disbursed in 1981 and 1982. For that reason as well, the ITAS does not save this claim from untimeliness.
B
The two cross-appeals, filed by claimants, concern a series of proposed claims principally asserted under (1) the 1863 Acts, (2) the 1851 and 1858 treaties, and (3) the Indian Non-Intercourse Act. We affirm the Claims Court’s determination that claimants have failed to establish a viable cause of action under any of these (or other) authorities.
1
We begin with the 1863 Acts. The full text of Section 9 of the February Act provides:
[T]he Secretary of the Interior is hereby authorized to set apart of the public lands, not otherwise appropriated, eighty acres in severalty to each individ *1292 ual of the before-named bands who exerted himself in rescuing the whites from the late massacre of said Indians. The land so set apart shall not be subject to any tax, forfeiture, or sale, by process of law, and shall not be aliened or devised, except by the consent of the President of the United States, but shall be an inheritance to said Indians and their heirs forever.
Act of Feb. 16, 1863, ch. 37, § 9, 12 Stat. 652, 654.
Although repackaged in several proposed causes of action, claimants make two basic claims under this provision, separately premised on each of its two sentences. First, they argue that the opening sentence, which authorizes the Secretary to set aside 80 acres of land to each loyal Sioux, imposed a duty to set aside such lands — a duty that the Secretary breached by not doing so. Second, and in tension with the first point, claimants contend that certain actions taken in 1865 actually did set aside land for the loyal Sioux under the statute, thereby giving rise to the more concrete rights specified in the provision’s second sentence. We conclude that claimants have failed to establish the viability of either claim.[2]
The analysis of the first sentence’s declaration that the Secretary “is hereby authorized to set apart” parcels of land for the loyal Sioux is straightforward. That declaration is simply too discretionary to support a viable claim for damages on its own. See Wolfchild, 101 Fed.Cl. at 70-73. We have long recognized that statutes granting officials “substantial discretion” are “not considered money-mandating,” Price v. Panetta, 674 F.3d 1335, 1339 (Fed.Cir.2012), and this provision fits squarely within that rule. It does not impose any duty on the Secretary to make the land grants that it authorizes. It therefore cannot “ ‘fairly be interpreted as mandating compensation for damages sustained’ ” from a failure to provide such lands. Navajo II, 556 U.S. at 291, 129 S.Ct. 1547.[3]
Claimants fare no better in their attempt to make out a claim based on the more absolute rights set forth in the statute’s second sentence. Because those rights attach only to land that was “set apart” under the authority granted in the provision’s first sentence, any such claim must be premised on affirmative actions taken under that authority. Act of Feb. 16, 1863, § 9, 12 Stat. at 654. Claimants contend that the Secretary did in fact take the necessary steps to set apart land under the Act, focusing our attention on certain events in 1865. Specifically, they contend that the Secretary identified 12 sections of land for the loyal Sioux and withdrew them from public sale, which sufficiently “set apart” those lands to make the section’s second sentence applicable.
Those 1865 actions, however, cannot support a timely claim for relief, regardless of whether they could qualify as having “set apart” land under the Act. After it *1293 took the steps toward conveyance of the 12 sections to the designated Indians in 1865, the government terminated the process and sold the parcels to others. Claimants have not alleged error in the Claims Court’s finding that all of the 12 sections were sold no later than 1895, which was apparently not disputed by any claimants in the Claims Court. See Wolfchild, 101 Fed.Cl. at 74. The six-year statute of limitations, therefore, has long since run.
Because claimants cannot state a claim under either sentence of Section 9 of the February 1868 Act, we affirm the Claims Court’s conclusion that claimants “lack any claim grounded in the 1863 Acts.” Wolfchild, 101 Fed.Cl. at 76.[4]
2
In addition to the claims brought directly under the 1863 Acts, some claimants also ask us to recognize a separate claim based on an alleged violation of rights granted in the 1851 and 1858 treaties. We decline to do so. First, it does not appear that claimants asserted an independent, treaty-based claim in the Claims Court. That court never addressed a separate cause of action for treaty rights in either of its extensive decisions, and claimants have not pointed to any proposed complaint attached to a motion to amend in which such a claim was asserted. The claim is therefore waived. E.g., San Carlos Apache Tribe, 639 F.3d at 1354-55.
In any event, claimants have not shown that any perceived third-party rights arising under the treaties survived the February 1863 Act. (Claimants seek to obtain property they say should have been, but was never, granted under the treaties; their claim does not concern property that was granted in fee under the treaties before the annulment, with vesting of rights then secured by state or other non-treaty law.) The February 1863 Act is categorical in pronouncing that “all treaties” entered into with the Minnesota Sioux “are hereby declared to be abrogated and annulled, so far as said treaties or any of them purport to impose any future obligation on the United States,” before going on to declare that “all lands and rights of occupancy” in Minnesota and “all annuities and claims heretofore accorded to said Indians” are “forfeited.” Act of Feb. 16, 1863, ch. 37, 12 Stat. 652. The provision makes no exemption for the loyal Sioux or any other individual Indians.
Claimants nevertheless contend that their claims survived the annulment. Their theory appears to be that, because Section 9 of the February 1863 Act was intended to provide the loyal Sioux a substitute for lost treaty rights and was not implemented, they may turn instead to the treaties as a source of actionable rights. But the annulment of the treaties was not conditional on Section 9, including any discretionary acts authorized by Section 9, and claimants must therefore assert rights under the statute, not the treaties. We can find no basis to hold that the asserted third-party treaty rights survived the February 1863 Act.
3
The final source of proposed claims that we address is the Indian Non-Intercourse Act (INIA), which provides that “[n]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless *1294 the same be made by treaty or convention entered into pursuant to the Constitution.” 25 U.S.C. § 177. Claimants invoke this statute in support of two sets of claims: (1) “land” claims alleging that the government improperly sold lands to which claimants were entitled under the 1851 and 1858 treaties and the 1863 Acts and improperly transferred land to the three communities that had been purchased for claimants under the 1888-1890 Acts and the 1934 IRA; and (2) “fund” claims alleging that INIA coverage imposes a fiduciary duty on the United States that requires disbursement of revenues to claimants rather than the three communities. We conclude that, even if the INIA imposes a money-mandating duty on the United States (which we need not decide), none of these theories supports a viable claim under the statute.[5]
First, it does not appear that there is anything left to sustain an INIA claim once the assertions of property rights under the 1888-1890 Acts, the 1863 Acts, and the 1851 and 1858 treaties are rejected. The INIA prohibits the improper disposition of Indian lands, which necessarily presumes that the complaining party holds “lands, or ... any title or claim thereto.” 25 U.S.C. § 177. Without a source of extant property rights in any lands, claimants no longer have a basis for alleging this essential prerequisite to claiming an actionable conveyance under the INIA.
Second, even if claimants could identify a relevant property right, there is no sufficient basis for finding that claimants constitute a “tribe” within the meaning of the INIA. Specifically, claimants, whose defining characteristic is descent from Indians that broke their original tribal relations, have not shown error in the Claims Court’s conclusion that, at all relevant times, they have lacked the unitary organization required to be a tribe. See Wolfchild, 101 Fed.Cl. at 65-69. Claimants attempt to overcome the court’s finding by relying centrally on the contention that the beneficiaries of pre-1980 “reservation” lands qualify as a tribe. They point to those reservations as proof, for example, that the Indians occupied a sufficiently defined territory and had the requisite, unified political structure. But those arguments cannot help the claimants here because, even if the class of beneficiaries of the pre-1980 “reservation” lands qualified as one or more than one tribe under the INIA, that class simply is not coincident — though it overlaps — with the class of claimants in this case. Indeed, that is the whole reason for this lawsuit — the three communities that occupied and benefited from the pre-1980 reservations are not identical to this group of claimants. Accordingly, these claimants cannot look to those reservations in order to support a finding that they are a tribe under the INIA. We consequently affirm the Claims Court’s judgment on these claims.
Conclusion
When this case began, it was more narrowly focused: claimants had one principal theory. Having lost on that theory in 2009, claimants developed a number of alternative theories rooted in a variety of authorities. We now conclude that none of the new theories breathes life into this case because none supports an actionable claim for relief under governing law. We *1295 therefore reverse the Claims Court’s judgment against the United States on the claim to pre-1980 money and affirm its judgment against claimants on the remainder of the proposed claims.
Costs
No costs.
AFFIRMED IN PART, REVERSED IN PART.

. In addition to the revenues that the government held and ultimately paid to the communities, some money earned from leasing was apparently paid directly to third parties. There is no indication that claimants ever objected to this practice, yet their theory would seem to embrace those funds.

. Apart from claims to damages, claimants also seek affirmative relief under 28 U.S.C. § 1491(a)(2) related to the land that they believe they are owed under the Acts. Putting aside what our analysis of the Act may imply about the merits of that contention, it fails because relief under subsection (a)(2) must be “an incident of and collateral to” any damages judgment, so that this contention falls with the damages claims.

. Neither claimant group seems to have argued to this court that the March 1863 Act independently creates an applicable money-mandating duty, but the same analysis would apply. Providing that it "shall be lawful” for the Secretary to locate loyal Sioux on certain lands, Act of Mar. 3, 1863, ch. 119, § 4, 12 Stat. 819, is just another way of saying that the Secretary is authorized to do so.

. Based on statements in our 2009 opinion, Wolfchild, 559 F.3d at 1232, 1241, the parties and the Claims Court have disputed whether the March 1863 Act superseded Section 9 of the February 1863 Act. We find it unnecessary to resolve that dispute.

. To the extent that the claim to "funds” earned from the land rests in part on other authorities, our conclusion does not change. The 1888-1890 Acts and the 1863 Acts cannot support such a claim for the same reasons set forth in sections A.l and B.l, supra. Nor do claimants have a viable claim to any revenue produced on the additional land purchased for the three communities under the IRA, because, as they acknowledge, the government bought that land and took it into trust for the three communities from the outset.