# United States Court of Appeals for the Federal Circuit

---

**INTER-TRIBAL COUNCIL OF ARIZONA, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2019-1758

---

Appeal from the United States Court of Federal Claims in No. 1:15-cv-00342-NBF, Senior Judge Nancy B. Firestone.

---

Decided: April 17, 2020

---

MELODY MCCOY, Native American Rights Fund, Boulder, CO, argued for plaintiff-appellant.

PHILLIP SELIGMAN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JOSEPH H. HUNT, RUTH A. HARVEY, MICHAEL JOHN QUINN; KENNETH A. DALTON, Office of the Solicitor, Indian Trust Litigation Office, United States Department of the Interior, Washington, DC.

---

Before O'MALLEY, MAYER, and WALLACH, *Circuit Judges.*

WALLACH, *Circuit Judge.*

Appellant Inter-Tribal Council of Arizona, Inc. ("ITCA") filed a lawsuit against the United States ("Government") in the U.S. Court of Federal Claims, alleging that the Government breached its fiduciary duties established pursuant to the Arizona-Florida Land Exchange Act ("AFLEA"), Pub. L. No. 100-696, 102 Stat. 4571, 4577–93 (1988).[1] The Government filed a motion to dismiss ITCA's complaint for lack of subject matter jurisdiction and for failure to state a claim, pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the U.S. Court of Federal Claims ("RCFC"), respectively. The Court of Federal Claims granted the Government's motion in part, dismissing two of the Complaint's three claims. Specifically, the court found that it lacked jurisdiction over a portion of Claim I, and that Claim II and the remaining portion of Claim I failed to state a claim upon which relief could be granted. *See Inter-Tribal Council of Ariz., Inc. v. United States*, 140 Fed. Cl. 447, 460 (2018); *see also* J.A. 1 (Partial Final Judgment), 2–8 (Order on Plaintiff's Motion for Entry of Partial Final Judgment).[2]

---

[1]    ITCA "is a non-profit membership organization" of Indian tribes located in Arizona, "provid[ing] a united voice for tribal governments . . . with respect to issues of common interest and concern." J.A. 36; *see* J.A. 623 ("The goals of [ITCA] include programs to benefit the member [t]ribes and respective [t]ribal members and to improve the social and economic life of all Indian [t]ribes and tribal members in Arizona.").

[2]    Although the Court of Federal Claims also dismissed "portions" of Claim III of the Complaint, *Inter-*

ITCA appeals.  We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).  We affirm-in-part and reverse-in-part.

BACKGROUND[3]

I. Factual History

A. The Phoenix Indian School

From its inception in 1891, "an off-reservation federal Indian elementary and secondary boarding school" ("Phoenix Indian School") was "operated by" the U.S. Department of the Interior's ("DOI") Bureau of Indian Affairs, on land owned by the Government in Phoenix, Arizona.  J.A. 37–38.  The Phoenix Indian School "consisted of [thirty-four] buildings on over [one-hundred] acres located in the heart

---

*Tribal Council of Ariz.*, 140 Fed. Cl. at 460, that decision is not before us on appeal, *see generally* Appellant's Br.  *See* Appellee's Br. 16 n.6 ("Claim III . . . is pending below and is not part of the current appeal."); *see also Spectrum Pharm., Inc. v. Sandoz Inc.*, 802 F.3d 1326, 1333 (Fed. Cir. 2015) (explaining that "we will only address the issues raised [on appeal]").

    [3]    Because "this case was dismissed on the pleadings, for the purposes of this appeal, we must take the facts in the [C]omplaint as true." *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1334 (Fed. Cir. 2008).  Moreover, for purposes of its Motion to Dismiss, the Government did not dispute the facts asserted by ITCA in the Complaint.  *See* Motion to Dismiss Second Amended Complaint at 3 n.1, *Inter-Tribal Council of Ariz., Inc. v. United States*, No. 1:15-cv-00342-NBF (Fed. Cl. May 16, 2018), ECF No. 59 ("For purposes of this brief only, the factual allegations of the . . . [C]omplaint are assumed to be true.").  Thus, the Complaint "sets forth the uncontested factual backdrop for this appeal.  We recite here the facts pertinent to the issue[s] before us." *Fid. & Guar. Ins. Underwriters, Inc. v. United States*, 805 F.3d 1082, 1084 (Fed. Cir. 2015).

of central Phoenix." J.A. 38. "While open to members of tribes nationwide, the Phoenix Indian School primarily served tribes located in Arizona." J.A. 38. In 1987, as part of a larger movement to close boarding schools for students of Indian tribes, J.A. 38, the Government "determined that the Phoenix Indian School was no longer required or needed," J.A. 40, and the school "was closed in 1990," J.A. 50; *see* AFLEA § 404(a) (requiring the U.S. Secretary of the Interior ("Secretary") to "close the Phoenix Indian . . . School . . . no earlier than June 1, 1990, and no later than September 1, 1990"); *see also id.* § 401(18) ("'Secretary' means the Secretary of the Interior.").

B. The Arizona-Florida Land Exchange Agreement

"[S]ince at least 1984," the Government and Barron Collier Co. ("Collier") "had been discussing . . . the possible acquisition by the [Government]" of approximately 108,000 acres of wetlands owned by Collier in the Florida Everglades. J.A. 38, 246. "Lacking the funds to make an outright purchase of Collier's Florida lands," the Government "offered various surplus property that it held to Collier in exchange for the Florida lands." J.A. 38. "Collier ultimately selected" the property on which the Phoenix Indian School was located ("Phoenix Indian School Property"), after which the Government and Collier negotiated an exchange agreement that was executed in May 1988. J.A. 43. "The Exchange Agreement provided . . . that approximately [seventy-two] acres of the Phoenix Indian School Property would be conveyed to Collier[,]" in exchange for Collier's Florida lands. J.A. 43. "The Exchange Agreement [also] provided that Collier would pay $34.9 million in cash to the [Government] at closing," representing the difference in estimated value between the lands exchanged. J.A. 43–44. In November 1988, Congress enacted the AFLEA, which ratified the Exchange Agreement. *See* AFLEA § 402(b) ("The Exchange Agreement is ratified and confirmed and sets forth the obligations, duties, and

responsibilities of the parties to the Exchange Agreement."); *see also* J.A. 48.

### 1. The AFLEA

The AFLEA established two trust funds: an "Arizona InterTribal Trust Fund" ("AITF") "for the benefit of Arizona Tribes that were members of . . . [ITCA] . . . and the members of such tribes," AFLEA §§ 401(2), 405(a)(1); and a "Navajo Trust Fund" ("NTF") "for the benefit of the Navajo Tribe and its members," *id.* §§ 401(11), 405(a)(2).[4] The AFLEA required that "Monetary Proceeds," defined as "the cash amount required to be paid . . . by Collier upon closing," *id.* § 401(10), "be paid to the [Government] for deposit in the [AITF] and the [NTF]," *id.* § 403(a), with 95 percent "of the total amount" allocated to the AITF, and the remaining 5 percent allocated to the NTF, *id.* § 405(e). "Trust Income" from the AITF and NTF was to be used only for "supplemental educational and child-welfare programs, activities, and services for the benefit of" members of ITCA and the Navajo Nation, respectively, as well as "the design, construction, improvement, or repair of related facilities[.]" *Id.* § 405(d)(2)(A), (B); *see id.* § 401(21) ("'Trust Income' . . . means the interest earned on amounts deposited into [the AITF and NTF] and any amounts paid into each such trust fund in the form of annual Trust Fund Payments."); *see also id.* § 401(19) ("'Trust Fund Payment' means the payment . . . of the Monetary Proceeds for deposit into . . . the [AITF or NTF], in the form of a lump sum payment or annual payments[.]"). Additionally, "[a]n amount equal to 5 percent of the Trust Income" from the AITF and NTF, was to be "paid annually" to ITCA and the Navajo Nation, respectively, "for education, child welfare, community

---

[4]    Because the parties use the term "Navajo Nation" to refer to the "Navajo Tribe and its members" as set forth in the AFLEA, *see, e.g.*, Appellant's Br. 3 n.1; Appellee's Br. 6 n.2, we do as well.

development, and general administrative purposes[.]" *Id.* § 405(d)(4)(A), (B).

The AFLEA permitted the Secretary to "elect to receive" the Monetary Proceeds "in the form of either a lump sum payment or [thirty] annual payments[.]" *Id.* § 403(b). Relevant here, if the Secretary "elect[ed] to receive" the Monetary Proceeds "in the form of annual payments," Collier was required to make: (1) "[thirty] annual payments equal to the interest due on . . . the Monetary Proceeds[,]" *id.* § 403(c)(2)(A); and (2) "at the time of the last annual payment, a [principal] payment equal to . . . the Monetary Proceeds[,]" *id.* § 403(c)(2)(B). Further, if the Monetary Proceeds were to be received pursuant to the annual payment method, the Government, through the Secretary of the Treasury, was required to "hold in trust . . . security provided in accordance with the Trust Fund Payment Agreement." *Id.* § 405(c)(2); *see id.* § 401(20) ("'Trust Fund Payment Agreement' means an agreement providing for payment by the Purchaser of annual Trust Fund Payments for deposit into the [AITF] or the [NTF][.]").

## 2. The Trust Fund Payment Agreement, Deed of Trust, and Promissory Note

"In June 1991, Collier gave preliminary notice of [its] intent to accept [the Government's] offer on the Phoenix Indian School [P]roperty, but also told [the Government] that it would not proceed with the [Exchange Agreement] unless it could use the annual payment method[.]" J.A. 51. In September 1991, "over objections by" ITCA and the Navajo Nation, the Secretary "agreed to Collier's demand for the annual payment method." J.A. 54 (internal quotation marks omitted). In December 1991, Collier accepted the Government's offer. J.A. 55. Thereafter, Collier and the

Government proceeded to negotiate the terms of the land exchange. J.A. 55–61.[5]

In December 1992, Collier and the DOI executed a Trust Fund Payment Agreement ("TFPA"), J.A. 62; *see* J.A. 341–468 (TFPA), as well as a deed of trust, J.A. 64; *see* J.A. 529–99 (Deed of Trust). Consistent with the AFLEA, the TFPA required Collier to provide the Government with a promissory note "for [the] payment of $34.9 million 'with interest thereon.'" J.A. 62; *see* J.A. 349; *see also* J.A. 469–81 (Promissory Note). Importantly, the TFPA provided that the Deed of Trust and Promissory Note, which were attached as "Exhibits" to the TFPA, "constitute[d]" parts of the "TFPA" "as such term is used in the [AFLEA][.]" J.A. 346.

The Promissory Note—executed by Collier in December 1992, J.A. 62—required Collier to: (1) make thirty annual interest payments of $2,966,500 ("Trust Fund Payments"), reflecting an interest rate of "[8.5] percent . . . per annum" "on the Principal Amount," J.A. 63, 171; *see*

---

[5]    In October 1992, ITCA filed suit in the U.S. District Court for the District of Arizona ("Arizona District Court"), seeking to enjoin the Government from proceeding with the land exchange. J.A. 67–68; *see* J.A. 620–46 (ITCA's October 1992 Complaint). Among other concerns, ITCA was worried that the Government had "inadequately collateralize[d]" Collier's payment obligations. J.A. 68. The Arizona District Court denied ITCA's request for a preliminary injunction, J.A. 662; *see* J.A. 68, and in June 1993, granted the Government's and Collier's motion to dismiss, J.A. 663; *see* J.A. 69, finding, inter alia, "that the Secretary['s] . . . decision regarding the . . . adequacy of the collateral [was] precluded from judicial review," J.A. 662–63; *see* J.A. 68–69. The U.S. Court of Appeals for the Ninth Circuit affirmed. *See Inter Tribal Council of Ariz. v. Babbitt*, 51 F.3d 199, 203 (9th Cir. 1995)); *see also* J.A. 69.

J.A. 470, 473 ("Principal Amount means $34.9 million." (emphasis omitted)); and (2) "pay . . . the Principal Amount," J.A. 62; *see* J.A. 470.  Additionally, Collier was required to make thirty annual payments into an annuity ("Annuity"), "sufficient . . . to pay the [Government] a lump sum of [$34.9 million]" "on the completion" of those thirty payments.  J.A. 62; *see* J.A. 351–53.  According to the TFPA, the Promissory Note was "secured by the Annuity" and a "Trust Estate" as "defined in the Deed of Trust[.]" J.A. 350; *see* J.A. 63.  The Deed of Trust, in turn, provided that the Trust Estate consisted of fifteen acres of the Phoenix Indian School Property ("fifteen-acre Phoenix Indian School Property"), as well as Collier's development interests in about seven and one-half acres of land located in downtown Phoenix ("Downtown Development Interests"), which Collier acquired in an exchange with the City of Phoenix.  J.A. 535–37, 569–74; *see* J.A. 318 ("The obligations for payment will be secured by liens on Collier's interest in [fifteen] acres of the [Phoenix] Indian School [P]roperty and on about [seven and one-half] acres of downtown Phoenix land that Collier[] will receive as a result of a land exchange with the City of Phoenix."); *see also* J.A. 64.[6]

The Deed of Trust allowed Collier to request, and required the Government to release, portions of the Trust Estate if the value of the property remaining in the Trust Estate exceeded 130 percent of a defined "Release Level

---

[6]    Prior to execution of the TFPA, Collier agreed to "exchange[] some of the . . . Phoenix Indian School [P]roperty that it [was to] receive[] under the AFLEA with the City of Phoenix" for the Downtown Development Interests. J.A. 64; *see* J.A. 318.

Amount." J.A. 560–61; *see* J.A. 64.[7] The Deed of Trust also included a "Maintenance of Collateral Value" provision, which provided that if, after a partial security release, the "fair value" of the remaining unreleased property falls below 130 percent of the Release Level Amount, Collier "shall add to the Trust Estate" U.S. Government-backed securities sufficient in value to "restore the fair value" of the unreleased property to 130 percent of the Release Level Amount. J.A. 561; *see* J.A. 65. Finally, the TFPA, Promissory Note, and Deed of Trust each "provide[d] that resort for payment of the [Promissory] Note was to be solely against the Annuity and the Trust Estate[.]" J.A. 66; *see* J.A. 350 ("[R]esort for payment of the Promissory Note shall be solely against the Annuity and the Trust Estate[.]"), 471 (similar), 564 (similar).

## C. Collier's Performance and Default

In December 1997, Collier began making its required Trust Fund Payments—95 percent of which the Government "deposited . . . into the AITF"—as well as payments toward the Annuity. J.A. 70.[8] In 1998, and again in 2007, "Collier requested releases of [the] liens" on Collier's

---

[7]    The Deed of Trust defined the "Release Level Amount" as

(i) the unpaid principal plus accrued interest on the Promissory Note, less (ii) the value of [U.S.] Government-backed Securities and Deposited Monies held in the Trust Estate, and further less, after the expiration of two years from the [c]losing [d]ate . . . (iii) the fair value, at the time of the calculation, of the Annuity.

J.A. 560.

[8]    Collier's Trust Fund Payments and annuity payments were due December 18 of each year, beginning in 1997 and continuing through 2026. J.A. 508; *see* J.A. 175, 496, 507–08, 510.

Downtown Development Interests, "both of which the [Government] granted." J.A. 71. After the lien release in 2007, "only the [fifteen]-acre Phoenix Indian School [P]roperty remained in the Trust Estate to secure [Collier's] . . . obligations." J.A. 72. Although the Government "received appraisals submitted by Collier" "[i]n connection with the two lien releases," the Government "did not perform or cause to be performed its own appraisals of the security in the Trust Estate either before or after releasing the liens." J.A. 71. At that time, the Government also "did not provide notice to ITCA of its decisions to release the liens" on Collier's Downtown Development Interests, and "did not provide information to ITCA from which ITCA could independently calculate the value of the existing or remaining security that the [Government] held in the Trust Estate[.]" J.A. 72.

In December 2012, after making fifteen Trust Fund Payments of $2,966,500, "for a total of $44,497,500[,]" and fifteen annual payments into the Annuity for a total of $9,662,000, J.A. 665; *see* J.A. 70, Collier met with the DOI to discuss Collier's remaining payment obligations and "to see if [they] c[ould] find an alternative that would be beneficial for all parties involved[,]" J.A. 665. Later that month, Collier failed to make its required Trust Fund Payment to the Government and also failed to make its annual annuity payment. J.A. 74; *see* J.A. 175. In January 2013, Collier informed the Government of its intent to "no longer make payments," J.A. 74; *see* J.A. 665 (Collier explaining that it was "simply not in a position to continue to make payments of such a significant magnitude"), explaining that the value of the fifteen-acre Phoenix Indian School Property had decreased to a point "far below [Collier's] remaining obligation[,]" "mak[ing] the economics of the deal untenable for [Collier]," J.A. 665. Specifically, as of January 2013, "the only offer [Collier] ha[d] received" for the property was for $6 million, J.A. 665; *see* J.A. 74–75, whereas, Collier's "remaining obligation consist[ed] of another $44,497,500 in interest payments, and the remaining princip[al] [of]

approximately $22 million, for a total of approximately $66.5 million," J.A. 665; *see* J.A. 76.  Later that month, the DOI sent a letter to Collier, in which the DOI "noted that the value of the [remaining security] appeared to be less than 130 percent of the Release Level Amount," J.A. 74 (internal quotation marks omitted), and demanded that Collier "add to the [T]rust [E]state" additional security, J.A. 731; *see* J.A. 75.  By March 2013, the DOI shared these letters with ITCA, informing ITCA that Collier was in default and that Collier's obligations were under collateralized.  J.A. 75.  In April 2013, the DOI sent another letter to Collier, in which the DOI "repeated its demand" that Collier "supplement the value of the Trust Estate with [U.S.] [G]overnment-backed securities."  J.A. 75.

D. The Government Sought to Require Collier to Provide Additional Security

In January 2014, the Government filed suit against Collier in the Arizona District Court, "s[eeking] to require Collier to provide additional security to fulfill its contractual promises to the [Government]."  J.A. 76 (internal quotation marks omitted).[9]    The Government alleged that "[s]ince 2007, the value of the [fifteen]-acre [Phoenix] Indian School [P]roperty ha[d] dropped significantly, and that reduction in value ha[d] left the debt owed by Collier grossly under-collateralized."  J.A. 606; *see* J.A. 75.  Specifically, the Government alleged that "Collier [wa]s currently below its required level for collateral by an amount equal to $18,499,556," and thus "Collier [wa]s required to make additional pledges of collateral in the form of [U.S.]

---

[9]    The Government "sought to recover only four $2.9 million [Trust Fund] [P]ayments, reflecting payments missed for the years 2012, 2013, 2014[,] and 2015," J.A. 76 (emphasis omitted), but "did not take into account the $2.9 million annual [Trust Fund] [P]ayments due . . . each year after 2015 and until 2026," J.A. 77.

Government-backed securities in th[at] amount . . . to achieve the minimum level of 130[ percent] of the Release Level Amount anticipated as of December 31, 2015." J.A. 78. The Government and Collier "stipulated that the value of the [fifteen-acre] Phoenix Indian School [P]roperty (based on appraisals as of September 15, 2015) was $25 million," and that "[a]ccording to the [Government], the value of the Annuity as of November 30, 2015[,] was approximately $13.3 million." J.A. 76. In August 2016, the Arizona District Court "ordered [Collier] to render specific performance . . . by providing to the [Government] . . . [U.S.] [G]overnment-backed securities as added Trust Estate collateral[,]" and further ordered that "[t]he fair market value of the securities upon performance shall be the sum of (a) $20,452,281.00 and (b) $10,565.00 multiplied by the number of calendar days between July 22, 2016[,] and the date of performance." J.A. 784; *see* J.A. 79–80.

In September 2016, the Arizona District Court stayed execution of its judgment, pending resolution of post-trial motions, J.A. 973; and, in October 2016, the Arizona District Court stayed litigation, "except as to settlement related purposes[,]" based upon a "tentative" settlement agreement between the parties, J.A. 974. In July 2017, the Government and Collier "reached and executed" a settlement agreement, J.A. 80, after which the Arizona District Court "terminated [the case] in its entirety with prejudice[,]" J.A. 81. The Government "reported . . . that the . . . settlement ha[d] a projected gross recovery of $54.5 million, consisting of $16 million cash, $13.5 million in [the] [A]nnuity, and [the fifteen-acre] Phoenix [Indian School Property] with a 2015 appraised value of $25 million." J.A. 81. Pursuant to the settlement agreement, in July 2017, Collier paid "$16 million in cash" to the Government. J.A. 81. In 2018, the General Services Administration sold the fifteen-acre Phoenix Indian School Property for $18.5 million. J.A. 85.

## II. Procedural History

In April 2015, ITCA filed a lawsuit against the Government in the Court of Federal Claims, alleging that the Government breached its fiduciary duties established pursuant to the AFLEA. J.A. 86–91. The Complaint consisted of three claims. Relevant here, Claim I generally alleged "breaches of fiduciary obligations [on the part of the Government] regarding the [AFLEA]'s Trust Fund Payments security requirements," J.A. 86 (capitalization normalized); *see* J.A. 86–89, and Claim II generally alleged "breaches of fiduciary obligations [on the part of the Government] to collect, deposit[,] and make Trust Fund Payments required by the [AFLEA] for which earnings have been lost," J.A. 89 (capitalization normalized); *see* J.A. 89–90. In May 2018, the Government filed its Motion to Dismiss the Complaint for lack of subject matter jurisdiction and for failure to state a claim, pursuant to Rules 12(b)(1) and 12(b)(6) of the RCFC, respectively. *See* Motion to Dismiss Second Amended Complaint, *Inter-Tribal Council of Ariz., Inc. v. United States*, No. 1:15-cv-00342-NBF (Fed. Cl. May 16, 2018), ECF No. 59.[10] In October 2018, the Court of Federal Claims granted the Government's motion in part, dismissing Claim I for lack of subject matter jurisdiction and for failure to state a claim, and Claim II for failure to state a claim. *See Inter-Tribal Council of Ariz.*, 140 Fed. Cl. at 460.

---

[10] Rules 12(b)(1) and 12(b)(6) of the RCFC provide that "a party may assert the following defenses by motion: (1) lack of subject matter jurisdiction; . . . [and] (6) failure to state a claim upon which relief can be granted[,]" respectively.

DISCUSSION

I. Standard of Review and Legal Standard

"A plaintiff bears the burden of establishing subject-matter jurisdiction by a preponderance of the evidence." *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (citation omitted). "We review de novo a grant or denial of a motion to dismiss for lack of jurisdiction." *Hopi Tribe v. United States*, 782 F.3d 662, 666 (Fed. Cir. 2015). Likewise, "[w]e review the . . . grant of a motion to dismiss for failure to state a claim de novo." *Prairie Cty., Mont. v. United States*, 782 F.3d 685, 688 (Fed. Cir. 2015) (citation omitted) (italicization normalized). In either case, "[w]e take all factual allegations in the complaint as true and construe the facts in the light most favorable to the non-moving party." *Jones v. United States*, 846 F.3d 1343, 1351 (Fed. Cir. 2017); *see Pixton v. B & B Plastics, Inc.*, 291 F.3d 1324, 1326 (Fed. Cir. 2002) (applying the same standard "[w]hen a party has moved to dismiss for lack of subject matter jurisdiction"). A complaint should not be dismissed for failure to state a claim, "unless the complaint fails to 'state a claim to relief that is plausible on its face.'" *K-Tech Telecomms., Inc. v. Time Warner Cable, Inc.*, 714 F.3d 1277, 1282 (Fed. Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"[T]he Supreme Court has established a two-part test for determining jurisdiction under the Indian Tucker Act." *Hopi Tribe*, 782 F.3d at 667 (citing *United States v. Navajo Nation* (*Navajo Nation II*), 556 U.S. 287, 290 (2009)); *see* 28 U.S.C. § 1505 (Indian Tucker Act) (providing, in relevant part, that the Court of Federal Claims has jurisdiction over claims against the Government by Indian tribes "whenever such claim[s] . . . aris[e] under the . . . laws . . . of the United States"). "First, the tribe 'must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties.'" *Navajo Nation II*, 556

U.S. at 290 (quoting *United States v. Navajo Nation* (*Navajo Nation I*), 537 U.S. 488, 506 (2003)). "At th[is] first step, a statute or regulation that recites a general trust relationship between the [Government] and the Indian [tribes] is not enough to establish any particular trust duty." *Hopi Tribe*, 782 F.3d at 667. "Indian [t]ribes, moreover, cannot simply rely on common law duties imposed on a trustee; instead, tribes must point to specific statutes [or] regulations that 'establish the fiduciary relationship and define the contours of the [Government's] fiduciary responsibilities.'" *Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States*, 672 F.3d 1021, 1039–40 (Fed. Cir. 2012) (quoting *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 177 (2011)).

Second, "the [trial] court must . . . determine whether the relevant source of substantive law can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties the governing law imposes." *Navajo Nation II*, 556 U.S. at 291 (internal quotation marks, alterations, and citation omitted). "At th[is] second step . . . , common-law trust principles come into play." *Hopi Tribe*, 782 F.3d at 668. Specifically, "principles of trust law might be relevant 'in drawing the inference that Congress intended damages to remedy a breach.'" *Navajo Nation II*, 556 U.S. at 291 (quoting *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 477 (2003)). Indeed, the Supreme Court "ha[s] consistently recognized that the existence of a trust relationship between the [Government] and an . . . Indian tribe includes as a fundamental incident the right of an injured beneficiary to sue the trustee for damages resulting from a breach of the trust." *United States v. Mitchell*, 463 U.S. 206, 226 (1983); *see id.* ("Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties.").

Finally, "[t]he jurisdiction of the Court of Federal Claims is limited by the six-year statute of limitations of

28 U.S.C. § 2501." *Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320, 1325 (Fed. Cir. 2016); *see* 28 U.S.C. § 2501 ("Every claim of which the . . . Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."); *see also Martinez v. United States*, 333 F.3d 1295, 1316 (Fed. Cir. 2003) ("It is well established that statutes of limitations for causes of action against the United States, being conditions of the waiver of sovereign immunity, are jurisdictional in nature."). Relevant here, "[a] cause of action for breach of trust traditionally accrues when the trustee 'repudiates' the trust and the beneficiary has knowledge of that repudiation." *Shoshone Indian Tribe*, 364 F.3d at 1348 (citation omitted). "A trustee may repudiate the trust by express words or by taking actions inconsistent with his responsibilities as trustee." *Id.* (citation omitted). While "[t]he beneficiary . . . may bring [an] action as soon as he learns that the trustee has failed to fulfill his responsibilities," "[i]t is often the case . . . that the trustee can breach his fiduciary responsibilities of managing trust property without placing the beneficiary on notice that a breach has occurred." *Id.* "It is therefore common for the statute of limitations to not commence to run against the beneficiaries until a final accounting has occurred that establishes the deficit of the trust." *Id.* (citation omitted).

## II. The Court of Federal Claims Improperly Dismissed a Portion of Claim I of the Complaint

The Court of Federal Claims dismissed Claim I of the Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the RCFC. *See Inter-Tribal Council of Ariz.*, 140 Fed. Cl. at 455–57, 460. Specifically, as to Claim I's allegation that the Government "failed to ensure . . . adequate security for the entire amount of the trust fund obligations . . . , when it negotiated the TFPA in 1992[,]" *id.* at 455, the Court of Federal Claims concluded that, "[b]ecause ITCA clearly knew about the terms of the TFPA and the amount of

security that Collier was required to hold more than six years before [ITCA] filed [its] lawsuit," that portion of Claim I "is barred by the six-year statute of limitations," *id.* at 457; *see* 28 U.S.C. § 2501.  As to the remaining allegations of Claim I, viz., that the Government failed to maintain "sufficient" or "adequate" security in the Trust Estate over time, *id.* at 455, the Court of Federal Claims concluded that the Government was not "required . . . to do anything more than it did in filing suit . . . to obtain the additional security from Collier. . . . Therefore, ITCA has not stated a claim for relief in [Claim] I[,]" *Id.* at 457.

ITCA contends that the Court of Federal Claims erred on both grounds of dismissal.  First, ITCA argues that the Court of Federal Claims erred by "fail[ing] to interpret correctly the express and unambiguous terms and structure of the [AFLEA]," as well as ignoring and misinterpreting "key terms in the TFPA and related documents," which "led the [Court of Federal Claims] to conclude" that the Government was "authorized . . . to hold less security than was needed to secure all the Trust Fund Payments required by the [AFLEA]." Appellant's Br. 9.  Second, the Court of Federal Claims also erred, ITCA argues, in concluding that ITCA failed to file its lawsuit within the six-year statute of limitations period following "the execution of the TFPA . . . , despite the continuing nature of the security obligations imposed under the [AFLEA], and the fact that ITCA had no means by which to know the dollar value of the security[.]" *Id.* at 9–10.

As discussed below, we agree with ITCA, and find that the Court of Federal Claims erred in dismissing the failure-to-maintain-sufficient-security portion of Claim I at this stage of the proceedings.  As to the remainder of Claim I, however,  we agree with the Court of Federal Claims that it should be dismissed.

A. The Government's Alleged Failure to Maintain
Sufficient Security in the Trust Estate

Beginning with the first step of the Supreme Court's two-part jurisdictional test, we must initially consider whether ITCA has identified a "'substantive source of law'" that establishes a specific fiduciary duty. *Navajo Nation II*, 556 U.S. at 290 (quoting *Navajo Nation I*, 537 U.S. at 506). Section 405(c)(2) of the AFLEA, which ITCA identified in the Complaint as imposing a fiduciary duty upon the Government, *see, e.g.*, J.A. 50, 64, provides that if, as was the case, the Monetary Proceeds were to be received "in the form of annual payments[,]" the Government "shall hold in trust the security provided in accordance with the [TFPA][.]" The TFPA, in turn, defines the security to be held, as well as the security's intended purpose. Specifically, the TFPA required Collier to pay *both* the Principal Amount and "interest thereon[,]" J.A. 349, 470 (Promissory Note) ("Collier . . . promises to pay . . . the Principal Amount . . . with interest thereon[.]"), and the Government was required to hold the Annuity and Trust Estate as security against those payment obligations, J.A. 350 ("The parties acknowledge that the Promissory Note . . . is secured by the Annuity, and the 'Trust Estate[.]'").[11] The

---

[11]     The parties dispute whether the security to be held by the Government was intended to secure all thirty years of required annual interest payments, i.e., Trust Fund Payments, or only accrued interest. ITCA contends, for example, that "all of the unpaid annual payments" were to be secured to "ensur[e] that all annual payments and the final payment were fully secured throughout the [thirty]-year period." Appellant's Br. 18. To support its position, ITCA relies on the Government's purported admission before the Arizona District Court that the security was intended to secure "any and all unpaid annual payments for the entire

———————————

[thirty]-year period[,]" *id.* at 18 n.7, and on DOI statements that "ma[k]e clear [that the DOI] understood the [Government] had to secure both the $34.9 million final payment at the end of the [thirty]-year period and the annual payments[,]" *id.* at 13 (citing J.A. 202 (a DOI attorney explaining that "we're not only securing the $35 million at the end of the [thirty-]year period but we also want to secure payments of those annual interest payments")); *see* J.A. 246 (the Assistant Secretary for Fish and Wildlife and Parks explaining that the DOI and Collier "must execute" an agreement "to secure [thirty] years of interest payments and a final payment of $34.9 million for the Indian trust funds"). The Government contends, however, that "such individual opinions cannot, as a matter of law, create a duty for the [Government][,]" Appellee's Br. 26, and that "ITCA falsely claims that the [Government] took a position in its litigation with Collier that the Deed of Trust's accrued interest provision covers all [thirty] years of payments[,]" *id.* at 27 n.7. While we acknowledge that Collier, as part of its payment obligations under the TFPA, undertook to pay "thirty . . . consecutive annual interest payments[,]" J.A. 470; *see also* AFLEA § 403(c)(2)(A) (requiring Collier to make "[thirty] annual payments equal to the interest due on . . . the Monetary Proceeds"), we take no position on the issue of whether the security to be held by the Government was intended to secure all thirty years of required annual interest payments, as this issue is not material to our present determination, and also because the Court of Federal Claims did not pass on this issue below, *see generally Inter-Tribal Council of Ariz.*, 140 Fed. Cl. at 454–60. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."). Although we expect this issue will ultimately need to be resolved, for purposes of this appeal, it is enough that the

AFLEA confirms this purpose, and demonstrates Congress's expectation that the security was to be maintained at a level sufficient to secure Collier's payment obligations. *See, e.g.*, AFLEA § 402(h)(3)(D)(ii) (requiring "[a]ny [other] person seeking to acquire" the Phoenix Indian School Property to provide "evidence" of "collateral . . . adequate to secure the payment obligations . . . under the [TFPA]"), (5)(B)(iii) (requiring the Secretary to "exclude from consideration any [other] offer . . . fail[ing] to identify collateral that is adequate to secure the [payment] obligations under the [TFPA]"). The Deed of Trust—which was expressly made part of the TFPA, J.A. 346—makes this expectation explicit by requiring the "fair value" of the Trust Estate to be maintained at or above 130 percent of the Release Level Amount, J.A. 561. Finally, the AFLEA provides that Collier's payments, and interest earned thereon, were to be "used" exclusively "for the benefit of," or paid directly to, ITCA and the Navajo Nation. *Id.* § 405(d)(2), (4). Thus, the AFLEA, in combination with the TFPA, "defines a fiduciary relationship" by providing that the Government was to "hold in trust" security, at a level adequate to secure Collier's payment obligations, for the benefit of ITCA and the Navajo Nation. *White Mountain Apache Tribe*, 537 U.S. at 474.[12]

---

Government has acknowledged that Collier's debt had become "grossly under-collateralized." J.A. 606.

[12] The Assistant Secretary for Indian Affairs acknowledged this fiduciary relationship when, in September 1991, he explained to the Secretary that one of the "most important factors to be considered in analyzing [Collier's payment] options," was the "degree of security provided [to] the [DOI] in fulfilling its trust responsibilities to the beneficiaries of the trust," J.A. 224, and again in March 1992, when, in discussing a "collateral agreement to

Moreover, the Deed of Trust invested the Government with discretionary control over the level of security held in trust, by, for example, granting the Government exclusive authority to "release or reconvey" all or any portion of the Trust Estate "at any time at [its] option[.]"  J.A. 547; *see* J.A. 547 (granting the Government authority to "take or release any other or additional security"); *see also White Mountain Apache Tribe*, 537 U.S. at 466 (explaining that because "[t]he statute expressly defines a fiduciary relationship . . . , then proceeds to invest the [Government] with discretionary authority" over "the trust corpus[,]" it "permits a fair inference that the Government is subject to duties as a trustee"); *Hopi Tribe*, 782 F.3d at 668 ("[B]y using trust language in conjunction with an authorization of plenary control of the [property], Congress clearly accepted a fiduciary duty to exercise that authority with the care charged to a trustee at common law.").  While the Deed of Trust also provided Collier with the "right to require" the Government to release portions of the Trust Estate, Collier's right was expressly limited, J.A. 561, and the Government otherwise maintained "full responsibility to manage [the level of security held in trust] for the benefit of the Indians[,]" *Mitchell*, 463 U.S. at 224.  Accordingly, ITCA identified a "substantive source of law"—AFLEA § 405(c)(2)—

secure the Indian's interest" with Collier, the Assistant Secretary explained that ITCA and the Navajo Nation, "[a]s the beneficiaries of the[] proceeds, . . . ha[d] a major concern regarding the security of th[e] anticipated flow of income over the next thirty years[,]" and that while the Secretary had tried to "accommodate Collier" in negotiating acceptable collateral, the Secretary was required to "fully meet[] . . . his trust responsibilities to the Indian tribes," including the "obligation to protect the Indian tribes' financial interest[,]" J.A. 263.

in the Complaint that establishes a specific fiduciary duty. *Navajo Nation II*, 556 U.S. at 290.

Next, as part of the first step of the Supreme Court's jurisdictional test, we must also consider whether ITCA alleged that the Government has "failed to faithfully perform" its fiduciary duty. *Id.* Claim I of the Complaint does exactly this, alleging that the Government breached its fiduciary obligations by failing to maintain "sufficient security in the Trust Estate[.]" J.A. 87; *see* J.A. 87–88. The Government's representations to the Arizona District Court support this allegation, as the Government acknowledged that the value of the Trust Estate fell below the Release Level Amount "sometime after" the Government released liens on Collier's Downtown Development Interests in 2007, J.A. 72, and that by January 2014, "the debt owed by Collier [had become] grossly under-collateralized," J.A. 606; *see* J.A. 74–75. In fact, by as early as March 2012, the value of the Trust Estate had decreased to a point "far below" the value of Collier's "remaining obligation[s]." J.A. 665; *see* J.A. 74–75. While the Government has attributed this to a "decline in [property] value[s]" caused by the economic downturn of 2008, J.A. 72; *see* J.A. 75, it appears to be the result of much more. ITCA alleged, for example, that the Government released the liens on Collier's Downtown Development Interests without "perform[ing] . . . its own appraisals of the security in the Trust Estate[,]" or otherwise "determin[ing] whether sufficient security would remain . . . in the Trust Estate to secure [Collier's] obligations." J.A. 71; *see* J.A. 72.[13] ITCA further

---

[13]    The Government contends, and ITCA agrees, that "under the [TFPA]" Collier had an "obligation . . . to monitor the level of security" remaining in the Trust Estate. Oral Arg. at 24:18–24:23, 30:53–31:05, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2019-1758.mp3.

alleged that, despite Collier's obligation to "restore the fair value" of the Trust Estate to 130 percent of the Release Level Amount, J.A. 561, the Government "did not demand that Collier substitute security at any time up to and before the lien releases . . . or even after the economic downturn," J.A. 73. Instead, the Government "only demanded that Collier provide substitute security after Collier defaulted," J.A. 73, at which point Collier's obligations had already become substantially—if not "grossly," J.A. 606—under collateralized, and "economic[ally] . . . untenable," J.A. 665. Finally, ITCA alleged that the Government "did not provide notice to ITCA of its decisions to release the liens[,]" and "did not provide information to ITCA from which ITCA could independently calculate the value of the existing or remaining security that the [Government] held in the Trust Estate, either before or after releasing the liens." J.A. 72. In fact, it was not until March 2013, that the Government disclosed to ITCA that Collier had defaulted and that Collier's obligations were under collateralized. J.A. 75; *see* Oral Arg. at 7:37–8:00.

If proven, ITCA's allegations would demonstrate a breach of the Government's fiduciary duty to "hold in trust the security" against Collier's payment obligations, including the duty to preserve the property held in trust, *see White Mountain Apache Tribe v. United States*, 249 F.3d

---

Even assuming that such an obligation exists, a matter about which the TFPA is silent, *see generally* J.A. 341–468, any such obligation is separate and distinct from those imposed on the Government pursuant to the AFLEA, and does not, and indeed cannot, relieve the Government of obligations arising from its statutory fiduciary duty, *see Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 224 (1986) ("If the . . . statute is otherwise within the powers of Congress, . . . its application may not be defeated by private contractual provisions.").

1364, 1378 (Fed. Cir. 2001) ("Under the common law of trusts, it is indisputable that a trustee has an affirmative duty to act reasonably to preserve the trust property."); *see also* Restatement (Third) of Trusts § 77 (2007) ("The trustee has a duty to administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust."), as well as the duty to provide ITCA with pertinent information, *see In re United States*, 590 F.3d 1305, 1312 (Fed. Cir. 2009) ("[T]he fiduciary has a duty to disclose all information related to trust management to the beneficiary."); *see also* Restatement (Third) of Trusts § 82 cmt. d (2007) (A trustee has an "affirmative" duty to "inform . . . beneficiaries of important developments and information that appear reasonably necessary for the beneficiaries to be aware of in order to protect their interests."). This is especially so, in light of the "most exacting fiduciary standards" by which the Government is to conduct itself "in its relationship with . . . Indian beneficiaries." *Shoshone Indian Tribe*, 364 F.3d at 1348 (internal quotation marks and citation omitted).

Two particular allegations make the Government's purported conduct in this case particularly troubling. First, after the lien release in 2007, only real property, viz., the fifteen-acre Phoenix Indian School Property, remained in the Trust Estate, J.A. 72, a practice which the Government, in September 1991, cautioned against, J.A. 203–204 (DOI officials advising against "real estate as part of the security" because "[n]obody knows what [real] property is going to be worth [ten]–[fifteen] years from now. It[']s tough to get rid of [real] property in a bad market" and "even in a good market [it] isn't all that liquid"), 211 (a DOI attorney explaining that "[b]ased upon my experience . . . , I become concerned about a portfolio that proposes exclusively in real estate"). Indeed, as the Assistant Secretary for Indian Affairs explained to the Secretary that same month, "because of the uncertain value of the [Phoenix Indian School] [P]roperty . . . , securing the full amount of the

Indian trust funds with the property would not be adequate in meeting our trust responsibilities." J.A. 226. Second, "Collier's debt was 'nonrecourse,'" J.A. 66, such that when Collier defaulted, the Government was required to "solely resort to, and proceed in rem against" the security held by the Government, J.A. 471; *see* J.A. 350 (similar), 564 (similar). Accordingly, ITCA alleged that the Government has "failed to faithfully perform" its fiduciary duty. *Navajo Nation II*, 556 U.S. at 290.

Turning to the second step of the Supreme Court's jurisdictional test, we must determine whether the AFLEA "can be fairly interpreted as mandating compensation for the [G]overnment's fiduciary wrongs[.]" *Id.* at 292 (internal quotation marks and citation omitted). Here, because the AFLEA "clearly establish[es] fiduciary obligations of the Government in the management" of the security to be held in trust, "[it] can fairly be interpreted as mandating compensation by the . . . Government for damages sustained" by ITCA. *Mitchell*, 463 U.S. at 226. Moreover, if ITCA is precluded from recovery for the Government's breach of its fiduciary duty, the Government's failure to timely provide information to ITCA has rendered "prospective equitable remedies . . . totally inadequate." *Id.* at 227; *see id.* ("In addition, by the time government mismanagement becomes apparent, the damage to Indian resources may be so severe that a prospective remedy may be next to worthless."); *see also id.* ("A trusteeship would mean little if the beneficiaries were required to supervise the day-to-day management of their estate by their trustee or else be precluded from recovery for mismanagement."). Accordingly, the AFLEA "can be fairly interpreted as mandating compensation for the [G]overnment's fiduciary wrongs[.]" *Navajo Nation II*, 556 U.S. at 292.

Finally, because the Government failed to disclose to ITCA that Collier had defaulted and that Collier's obligations were under collateralized until March 2013, J.A. 75; *see* Oral Arg. at 7:37–8:00, the statute of limitations did not

commence to run against ITCA before that time, *see Shoshone Indian Tribe*, 364 F.3d at 1348.[14]   Thus, Claim I, originally filed in April 2015, J.A. 86, was brought well within the six-year statute of limitations on claims brought against the Government in the Court of Federal Claims, *see* 28 U.S.C. § 2501.   Indeed, the Court of Federal Claims agreed that "this portion of Claim I is not time barred." *Inter-Tribal Council of Ariz.*, 140 Fed. Cl. at 457; *see id.* ("As to th[at] portion of Claim I, that is ITCA's claim that the [G]overnment breached its trust obligation by failing to ensure that Collier maintained sufficient collateral as required by the Deed of Trust when the collateral amount fell below 130[ percent] of the Release Level Amount when it released liens in 1998 and 2007 as well as when Collier defaulted in 2013, the [C]ourt [of Federal Claims] finds this portion of Claim I is not time barred[.]").   Accordingly, the portion of Claim I that arises from the Government's alleged breach of its fiduciary duty to "hold in trust the security" against Collier's payment obligations, *see, e.g.*, J.A. 87–88, states a claim over which the Court of Federal Claims has jurisdiction, and upon which relief can be granted.   We therefore find that the Court of Federal Claims erred in dismissing the failure-to-maintain-sufficient-security portion of Claim I of the Complaint.

---

[14]   It is unclear from the record whether the letters provided to ITCA in March 2013, were sufficient to permit ITCA to "establish[] the deficit of the trust." *See Shoshone Indian Tribe*, 364 F.3d at 1348.   Thus, ITCA's claim for breach of the Government's fiduciary duty may have accrued at an even later date.   Either way, ITCA filed the Complaint well within the statutory limitations period. J.A. 86.

### B. The Government's Alleged Failure to Ensure Adequate Security When it Negotiated the TFPA

ITCA did not cite, and we have not found, support in the AFLEA, case law, or otherwise, for the proposition that the Government's fiduciary duty to "hold in trust" the security against Collier's payment obligations, imposes a concurrent duty on the Government to "negotiate terms in the TFPA and related documents to ensure adequate security" as ITCA alleged. J.A. 87. *See generally* Appellant's Br. Regardless, the TFPA was executed, and ITCA was made aware of the TFPA's terms, well before the six-year statute of limitations on claims brought against the Government in the Court of Federal Claims. J.A. 62, 67–68; *see* 28 U.S.C. § 2501; *see also Hopeland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576 (Fed. Cir. 1988) (explaining that § 2501 applies to "Indian tribes in the same manner as against any other litigant seeking legal redress or relief from the [G]overnment"). Accordingly, to the extent Claim I arises from the Government's alleged failure to ensure adequate security when it negotiated the TFPA, the Court of Federal Claims properly dismissed Claim I of the Complaint.

### III. The Court of Federal Claims Properly Dismissed Claim II of the Complaint

The Court of Federal Claims dismissed Claim II of the Complaint pursuant to Rule 12(b)(6) of the RCFC. *See Inter-Tribal Council of Ariz.*, 140 Fed. Cl. at 457–58, 460. Specifically, the Court of Federal Claims found that the AFLEA "does not impose any obligation on the [G]overnment to make payments if Collier fails to make payments. . . . Therefore, [Claim II] must be dismissed for failure to state a claim upon which relief can be granted." *Id.* at 458 (internal quotation marks, alterations, and citation omitted). ITCA contends, however, that the Court of Federal Claims "ignored the [AFLEA]'s mandates and erred under applicable case law . . . when it dismissed

ITCA's claim for damages based upon the [Government's] failure under the [AFLEA] to collect and pay all of the [AFLEA]'s required remaining annual payments and the full final payment after Collier's default." Appellant's Br. 10. We disagree with ITCA.

Claim II fails to state a claim upon which relief can be granted. Relevant to Claim II, ITCA contends that the AFLEA "required the [Government] to collect from Collier all Trust Fund Payments required under the [AFLEA], and that the [Government's] failure to collect all of the payments is a breach of trust for which the [Government] is liable." Appellant's Br. 26 (emphasis omitted). Specifically, ITCA alleged in the Complaint, that the Government "has not collected [or made] . . . any Trust Fund Payments—annual or final—from Collier since 2011." J.A. 74; *see* J.A. 89. However, ITCA did not cite, and we have not found, support in the AFLEA, case law, or otherwise, for the imposition of a duty consistent with this allegation. Instead, those portions of the AFLEA cited by ITCA for support, requiring, for example, that "[t]he Monetary Proceeds shall be paid to the [Government]," AFLEA § 403(a), impose, at most, a duty upon Collier, not the Government. In fact, § 403(c)(2) explicitly provides that the "Purchaser," defined as "Collier," *id.* § 401(16), "shall make" the requisite payments under the annual payment method.[15] Moreover, ITCA's reliance on *Shoshone Indian Tribe* to argue that despite "the lack of express collection duties," "provisions mandating payments from third parties imply the [G]overnment's collection duties," Appellant's Br. 28, is misplaced. *Shoshone Indian Tribe* concerned regulations

---

[15] During oral argument, ITCA acknowledged the lack of any explicit duty of the Government to collect Collier's Trust Fund Payments in the AFLEA, arguing instead, that any such duty "would be . . . implicit." Oral Arg. at 2:58–3:14.

that required the "Government [to] collect[] . . . all payments[.]" 364 F.3d at 1350. No such requirement or obligation is present in this case. Accordingly, because Claim II fails to state a claim upon which relief can be granted, the Court of Federal Claims properly dismissed Claim II of the Complaint.

## CONCLUSION

We have considered the parties' remaining arguments and find them unpersuasive. Accordingly, the Partial Final Judgment of the U.S. Court of Federal Claims is

**AFFIRMED-IN-PART AND REVERSED-IN-PART**